819 F.2d 889
 39 Ed. Law Rep. 1049
 Cherie MATTHEWS, Plaintiff-Appellant,
v.
HARNEY COUNTY, OREGON, SCHOOL DISTRICT NO. 4; Harney
County, Oregon, School District U.H. No. 1; Maurice Thorne,
in his individual and official capacities as Superintendent;
and Dee Doman, Connie King, Herbert Davis, Wess Mace and
Melinda Schaffer, each in their individual and official
capacities as members of Harney County School District No. 4
Board of Directors, et al., Defendants-Appellees.
 No. 85-4342.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 5, 1987.
Decided June 11, 1987.
 
 Bruce E. Smith, Eugene, Or., for defendants-appellees.
 Robert D. Durham, Portland, Or., for plaintiff-appellant.
 Appeal from the United States District Court for the District of Oregon.
 Before KOELSCH, GOODWIN and THOMPSON, Circuit Judges.
 GOODWIN, Circuit Judge:
 
 
 1
 Cherie Matthews, a former public school teacher at Crane Union High School in Harney County, Oregon, brought this action under the fourteenth amendment of the United States Constitution contending that she was deprived of liberty and property interests without due process of law. The district court granted summary judgment in favor of the defendants. We reverse.
 
 
 2
 On June 4, 1980, Cherie Matthews was hired by Maurice Thorne, superintendent for Harney County elementary school district No. 4 and high school district No. 1, to teach in the Crane schools for the 1980-81 school year. Matthews began teaching on August 21, 1980. On November 19, 1980, before the term of her contract had expired, she was dismissed by the board of the high school district.
 
 
 3
 Crane is a ranch community in eastern Oregon composed primarily of the elementary and high school facilities, which are located adjacent to each other. The Crane Union High School District covers a vast geographic area and, as a consequence, high school students live in dormitories on campus. The elementary school provides instruction in grades one through eight. Elementary school students commute daily to school from ranches in the vicinity.
 
 
 4
 Matthews was paid by the elementary school district although she taught primarily in the high school. Pursuant to an informal arrangement designed to reimburse the high school for classes she taught for elementary school students, the elementary school district paid Matthews' salary. The high school district board apparently had ultimate hiring and firing authority over her position. Matthews was not aware of these details.
 
 
 5
 On October 28, 1980, after being told by students that amphetamines were being sold on campus, Thorne announced that he was beginning an investigation of possible drug activity in the Crane schools. At approximately 8:00 p.m. that evening Matthews was approached by two students concerned that pills in their possession might be illegal. They showed Matthews a bottle containing three pills. Matthews took the pills, told a third student to tell Thorne that no pills were available for sale on campus, and told the students to go home and think about what they should do. An hour later the girls returned and indicated that they wanted to give the pills to Thorne. Matthews then flushed two of the pills down the toilet and accompanied the girls to Thorne's home. As Thorne was not at home, the girls delivered the remaining pill to his wife.
 
 
 6
 The next day Thorne called Matthews into his office to discuss the events of the previous evening. He told her that he planned to continue his investigation into the drug matter. On October 30, 1980, Thorne again called Matthews into his office. He criticized her for not coming to him immediately with the pills and for flushing some of them down the toilet. He again told her that he would continue to investigate the drug matter. Either at this meeting or at a later time, he also told her that her behavior on October 28 would come before the high school board at its next regular school board meeting.
 
 
 7
 On November 12, 1980, the high school board held its regularly scheduled meeting in executive session. Thorne asked Matthews to stay in the school building after classes to attend the board meeting and answer questions about the events on October 28. The board interviewed students involved in the incident and questioned Matthews about her participation. During the course of the questioning, Matthews became aware that certain members of the board were displeased with her behavior. She asked what, if anything, the board planned to do. The board's chairman, Robert Cargill, responded that they had not yet discussed any action that they might take with respect to her.
 
 
 8
 Later that evening the board again met in executive session. During this meeting, Matthews sent in a letter explaining to the board the reasons for her actions on October 28. The board members decided to stay overnight at the high school and reconvene the next day. On November 13, 1980, the board reconvened in executive session and interviewed additional students and parents. The board decided to suspend several students from the school. The board then met with Matthews and requested her resignation, stating that she could either resign or be fired. Matthews argued that the board's action was excessive, but eventually agreed to resign.
 
 
 9
 The next day Matthews went to Thorne's office and withdrew her resignation. Thorne told Matthews she was suspended without pay and gave her a copy of the statutory dismissal procedure for probationary teachers. On November 18, 1980, Thorne gave Matthews a letter directing her to attend a special board meeting the next evening where the board would review her situation.
 
 
 10
 On November 19, 1980, the board met and immediately went into executive session. Returning to open session, the board voted to dismiss Matthews from her teaching position. The board then invited Matthews into the meeting and told her that the meeting was in open session, and that the board had decided to dismiss her from her position effective immediately. Matthews was given a written statement of reasons for the dismissal and informed that she could submit a written request for a hearing on the matter within 10 days. Matthews stated that she had been advised to request a pretermination hearing, but that she assumed there was no chance for this to occur at this meeting. Matthews left the meeting.
 
 
 11
 On November 26, 1980, an article about Matthews' dismissal appeared in the Burns Times-Herald, a general circulation newspaper in Harney County. The article drew on the observations of a reporter present at the board's November 19 meeting and quoted from the written dismissal letter given to Matthews. On December 3, 1980, the newspaper published a follow-up article on the dismissal.
 
 
 12
 On December 11, 1980, the board met again to hold an evidentiary hearing regarding the dismissal. Matthews and her representative argued against the need for dismissal and contended that the elementary school board, as the contracting authority, had sole authority to dismiss Matthews. At the end of the hearing, the board voted unanimously to affirm its earlier dismissal decision.
 
 
 13
 On December 16, 1980, the elementary school board met and ratified the high school board's decision to terminate Matthews. After hearing of this action, Matthews requested an evidentiary hearing before the elementary school board. On May 4, 1981, the elementary school board held an evidentiary hearing on the matter and reaffirmed the action of the high school board in dismissing Matthews.
 
 
 14
 The fourteenth amendment's guarantee of due process applies when a constitutionally protected liberty or property interest is at stake. Board of Regents v. Roth, 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). Matthews alleges deprivation of qualifying property and liberty interests. We have held that a mid-year dismissal of a probationary teacher under applicable Oregon law implicates a property interest protectible under the due process clause. Vanelli v. Reynolds School District No. 7, 667 F.2d 773, 777 (9th Cir.1982). We have also held that a liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality and that procedural protections of due process apply if: (1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with termination of employment. Jones v. Los Angeles Community College Dist., 702 F.2d 203, 206 (9th Cir.1983); Vanelli, 677 F.2d at 777-78. Matthews alleges each of the necessary elements in this action.
 
 
 15
 We must now decide whether the pre-termination hearing procedures provided by the Crane high school district adequately protected Matthews' property and liberty interests. Matthews does not challenge the adequacy of the post-termination procedures she received after the dismissal on November 19, 1980. Rather, she attacks the pre-termination procedures followed by the board. The question is whether the pre-termination procedures satisfied due process within the meaning of Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).
 
 
 16
 In Loudermill, the Supreme Court held that even when state law provides for a full post-termination hearing, due process requires "some kind of hearing" in advance of termination. That hearing need not be a full adversarial hearing but must be preceeded by adequate notice and must afford the employee a meaningful opportunity to speak in her own defense. In particular, Loudermill holds that: "The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." 105 S.Ct. at 1495. See also Brock v. Roadway Express, Inc., --- U.S. ----, 107 S.Ct. 1740, 1745-49, 95 L.Ed.2d 239 (1987); Vanelli v. Reynolds School Dist. No. 7, 667 F.2d 773, 779-80 (9th Cir.1982) ("at a minimum one must be given notice and an opportunity to be heard 'at a meaningful time and in a meaningful manner.' ").
 
 
 17
 Defendants argue Matthews received all the pre-termination process she was due. They suggest that in advance of the November 19 meeting, Matthews received "adequate notice" of (1) the pendency of termination proceedings and (2) the charges and evidence against her. First, they suggest that increasingly critical comments voiced by Thorne and the board during their early encounters alerted Matthews that her job was in danger. Second, they contend that the letter Matthews submitted to the board on November 12 indicates that she understood the character of the charges and evidence against her.
 
 
 18
 Defendants further argue that Matthews received a "meaningful opportunity" to explain her side of the story to the board either directly or through conversations with Thorne. Matthews appeared before the board on November 12, 13, and 19. She submitted a letter to the board on November 12 which attempted to explain her actions on October 28. She also met with Thorne on October 28, 29 and November 14. Although defendants concede that Matthews was not fully aware in each of these encounters that her job was in danger, they argue that when the encounters are viewed in conjunction with each other, the pattern confirms that Matthews received a meaningful opportunity to explain her behavior.
 
 
 19
 The informal notice and pre-termination meetings with the board did not afford Matthews due process within the meaning of Loudermill. On the issue of notice, we read Loudermill to require, in advance of any pre-termination hearing (1) notice to the employee as to the pendency or contemplation of a dismissal action, and (2) notice as to the charges and evidence which give rise to that concern. 105 S.Ct. at 1495-96. When the contemplated dismissal stems from consideration of the employee's role in a matter of independent concern to the decisionmaker, full and timely notice to the employee is particularly important. Without such notice, an employee may find that his or her participation in an inquiry into what would appear to be an unrelated matter has resulted in a unforeseen termination of employment.
 
 
 20
 In this action, there is no serious question that Matthews eventually realized that her own role in the October 28 events concerned the board. The problem is whether that realization occurred in advance of the board's decision to terminate her employment. The record developed thus far leaves this question far from settled on two points. First, it is not clear when, if ever, in advance of termination, Matthews was told that her job was at risk and that the board was considering dismissal on the grounds of her alleged withholding of evidence and "cover-up" of information. Second, it is not entirely clear when the board actually made its termination decision.
 
 
 21
 A jury could reasonably find that the termination decision had been made on either November 13 or on November 19. In the November 13 board meeting, Matthews was asked to resign or be fired. Finding herself "between the Scylla of voluntary resignation and the Charybdis of forced termination," Fowler v. Carrollton Pub. Library, 799 F.2d 976, 981 (5th Cir.1986), she chose to resign. Although she withdrew her resignation the next day, a jury could find that by then the board had irrevocably decided to be rid of her. The other possible termination date is, of course, November 19, when the board told her that she was fired.
 
 
 22
 If November 13 is found to be the date of termination, Loudermill was not satisfied. As of that date, Matthews had met with the board on only one occasion to provide information to the board while it considered suspension for students allegedly involved in drug use. When she asked if action was contemplated with respect to her, she was told that no action had been discussed. On the next day, Matthews voluntarily submitted a written letter to explain her actions on October 28. While we do not decide the question, a jury could reasonably find that on November 13, Matthews was asked to resign before she was ever aware that her job was in jeopardy.
 
 
 23
 Similarly, even if a jury should find that November 19 was the date of termination, it could also find that Matthews had not received a meaningful pre-termination opportunity to be heard in her own defense. On November 18, Matthews received a letter directing her to attend a special board meeting the next day to review her situation. That letter did not inform Matthews about the nature of the charges placing her employment at risk. While Matthews must have realized, given her prior resignation and withdrawal of resignation, that the board would be discussing her continued employment, she may not have been aware that the board was concerned with aspects of her behavior occurring after the events of October 28. Such concern is evidenced by the November 19 dismissal letter Matthews received which gave as grounds for dismissal her alleged "withholding [of] vital information from the proper school authorities and trying to cover up information deemed important to the school board."
 
 
 24
 Additionally, a jury could reasonably find that, at the November 19 meeting, Matthews received no genuine opportunity to be heard. The minutes of the meeting reflect the following sequence of events:
 
 
 25
 The board was called out of executive session into regular session. Walt [Bailey] motioned Cherie Matthews be dismissed from present employment. Don seconded. Passed with 4 yes votes, Alfred [Dunton] abstained.
 
 
 26
 Cherie Matthews was invited into the board meeting and her OEA representative, Ms. Susan Rossiter.... Bob advised Mrs. Matthews the board had made the decision to dismiss her from her present employment.... The letter of dismissal was given to Mrs. Matthews. Ms. Rossiter asked if the letter gave the reasons for the dismissal and was advised it did. Mrs. Matthews stated she had been advised to ask for a dismissal hearing prior to being dismissed and assumed there was no chance for that to take place at this time.
 
 
 27
 Bob stated her dismissal would be effective immediately.
 
 
 28
 Apparently, Matthews was called into the meeting only after the board had already voted in favor of dismissal. A jury could find that the sequence of events rendered the November 19 encounter meaningless as a pre-termination opportunity to respond. See Washington v. Kirksey, 811 F.2d 561, 564 (11th Cir.1987) ("Due process of law [is not present] where the state has gone through the mechanics of providing a hearing, but the hearing is totally devoid of a meaningful opportunity to be heard."). This conclusion may be bolstered by the fact that with little additional administrative burden, the board could have informed Matthews of the charges against her and heard her side of the story before voting on whether to terminate her employment.[1]
 
 
 29
 Finally, we note that the cases cited by defendants for the proposition that an "informal hearing" or series of such meetings can be constitutionally sufficient under Loudermill are distinguishable. In those cases, the employee had received explicit written or oral notice, including detailed and comprehensive allegations of wrongdoing, in advance of the informal hearing or hearings. See Brown v. Texas A & M University, 804 F.2d 327, 335 (5th Cir.1986); Brasslett v. Cota, 761 F.2d 827, 836 (1st Cir.1985); DeSarno v. Dep't of Commerce, 761 F.2d 657, 660 (Fed.Cir.1985); Williams v. City of Seattle, 607 F.Supp. 714, 721 (W.D.Wash.1985). On the record developed thus far in this action, a jury could reasonably find that Matthews did not receive adequate notice or a meaningful opportunity to be heard.
 
 
 30
 For the foregoing reasons, we hold that the district court should not have summarily dismissed Matthews' action for deprivation of a property interest without due process of law.
 
 
 31
 Our conclusion as to Matthews' property interest claim requires reversal as to the liberty interest claim as well. The district court determined that because the board had satisfied the Loudermill requirements as to the property claim it had also satisfied due process as to the liberty claim. This equivalence may not be correct. Under the three-factor balancing test of Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), the liberty interest presented in this case may or may not have required more exacting pre-deprivation procedures. Compare Vanelli, 667 F.2d at 781 ("We cannot say, as a matter of law, that an individual will experience the same intensity and degree of suffering when a procedural deprivation impairs both a liberty and property interest as when it impairs only a property interest."), with Codd v. Velger, 429 U.S. 624, 627-28, 97 S.Ct. 882, 883-84, 51 L.Ed.2d 92 (1977) (implying that a post-deprivation "name-clearing" hearing may remedy a failure to provide a sufficient pre-deprivation hearing). In any event, because of the procedural posture of this case, we remand to allow the district court to determine in the first instance, under Mathews v. Eldridge, whether Matthews was wrongfully deprived of adequate pre-deprivation process with respect to her liberty interest.
 
 
 32
 Under Loudermill, with respect to her property interest claim, Matthews should have received formal notice of the charges against her, an explanation of the evidence against her, and an opportunity to respond prior to the board's decision to terminate her employment. Sufficient factual questions required the district court to try the property interest claim.
 
 
 33
 With respect to the liberty interest claim, publicity in the local paper becomes relevant. The district court should engage in a Mathews v. Eldridge balancing to determine what the board should have done, to afford Matthews due process.
 
 
 34
 REVERSED and REMANDED.
 
 
 
 [1]
 Our reasoning is consistent with the analysis described in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for use in determining the requisite formality of pre-termination procedures for protectible interests. Under Mathews, in public employment cases, we consider (1) the employee's private interest in retaining employment, (2) the government's interest in expeditious removal or demotion of unsatisfactory employees and in advoidance of administrative burdens, and (3) the risk of erroneous deprivation. Loudermill, 105 S.Ct. at 1494. Here, there would have been little additional administrative burden attached to the November 13 or November 19 board meetings if the board (1) had sought to give advance notice to Matthews of the charges leveled against her and (2) had offered, in advance of voting on the question of dismissal, time during the meeting for Matthews to explain her conduct and attempt to rebut the charges