William J. BRADY, M.D.,
Plaintiff–Appellee,
Cross–Appellant,

v.

Kristine M. GEBBIE, Director, Human Resources, Administrator, Health Division of the State of Oregon, Defendant–Appellant, Cross–Appellee.

Nos. 87–3839, 87–3877.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 11, 1988.

Decided Oct. 31, 1988.

Michael D. Reynolds, Asst. Atty. Gen., Salem, Or., for defendant-appellant, cross-appellee.

Bernard Jolles, Jolles, Sokol & Bernstein, Portland, Or., for plaintiff-appellee, cross-appellant.

Before GOODWIN, Chief Judge, ALARCON and FERGUSON, Circuit Judges.

FERGUSON, Circuit Judge:

Kristine M. Gebbie ("Gebbie") appeals from the district court order denying her motions for directed verdict and JNOV as to the liberty interest claim of William J. Brady, M.D. ("Brady"). Gebbie argues that the undisputed evidence shows that 1) Gebbie did not deprive Brady of a constitutionally protected liberty interest; 2) Brady received all the process he was due; and 3) Gebbie was protected by qualified immunity. Gebbie also appeals the denial of her motion for a new trial or remittitur on the grounds that the jury's award of damages was not supported by the evidence and was excessive and grossly disproportionate.

Brady cross-appeals from the district court's grant of a directed verdict for Gebbie on Brady's property interest claim. Brady argues that he had a constitutionally protected property interest in both his un-classified position as State Medical Examiner and his alleged right to return to classified service after termination of his unclassified job. He also appeals the district court's grant of partial summary judgment for Gebbie on the issue of his right to reinstatement. We affirm the decision of the district court on all of the issues.

I.

Brady, a board-certified hospital, clinical and forensic pathologist, was hired as Deputy Medical Examiner for the State of Oregon on January 1, 1969. In May, 1969, he became the State Medical Examiner. At that time, the position of State Medical Examiner was in the classified civil service. In January, 1977, the position was taken out of classified service and placed in management service; in September, 1977, the position was moved to the unclassified service.

From 1969 until January, 1979, Dr. Edward Press was Brady's supervisor. Dr. Press was succeeded by Gebbie, who remained Brady's supervisor until his discharge in October, 1985. At all times during his employment as State Medical Examiner, Brady received satisfactory or better evaluations from his supervisors. In addition to performing his official duties, Brady maintained a private practice, taught, and testified as an expert witness on numerous occasions.

On June 20, 1985, Brady was interviewed by a newspaper reporter who told him that she had information that he was selling body parts to finance parties in the morgue. After the interview, Brady called Gebbie and arranged to meet with her at her home that evening. At that meeting, Brady informed Gebbie about the interview. He also told her about a bank account which he had started while a county coroner and continued to keep after becoming State Medical Examiner. The unsolicited funds for the account apparently came primarily from small amounts of money forwarded to the coroner's office by the

National Pituitary Foundation.[1] Though the funds were deposited into an account in Brady's name, they were used for various amenities for the Medical Examiner's Office. The account was openly kept; all of the employees in the office knew about it. Gebbie refused Brady's offer to resign at that time, but agreed to meet with him after she met with the State Attorney General the next day.

On June 21, 1985, Gebbie learned from the Attorney General that there was a pending criminal investigation against Dr. Brady. One area of the investigation concerned the account Brady had discussed with Gebbie. Gebbie met with Brady later that day and again refused his offer to resign. She then gave him a letter of suspension and informed him that he was suspended without pay pending an investigation into charges of misuse of public funds. Gebbie also issued a press release in which she stated that 1) Brady had been suspended "pending a Department of Justice investigation into allegations that miscellaneous fees coming to the Medical Examiner's office were put into a special account, apparently for the purchase of office amenities"; 2) Brady had reported to Gebbie that the fund was set up to help with office extras and had been in existence for years; and 3) the Department of Justice was conducting an impartial investigation into the matter.

After the suspension, Brady was the subject of extensive—and often unfavorable—press coverage. On September 17, 1985, the Attorney General issued a report which concluded that criminal sanctions against Brady were not warranted. On September 25, 1985, Brady, his attorneys Ronald Hoevet and Judy Snyder, and Dr. Homer Harris, the former Chairman of the State Medical Advisory Board, met with Gebbie. After Brady refused to resign, Gebbie handed him a letter of proposed termination.

The letter charged Brady with violating various state and departmental policies and accounting procedures by 1) using the proceeds given in reimbursement for specimens and autopsy report transcriptions to establish and maintain a "slush fund" for office parties and amenities; 2) using state and county facilities to conduct private autopsies for personal gain and in violation of conflict of interest policies; and 3) causing the state to be billed and to pay for toxicological reports made in connection with private autopsies which Brady performed. The letter also stated that, on October 2, 1985, Brady would have the opportunity to come to Gebbie's office with his attorney to respond to the charges, and present mitigating or rebuttal information. Gebbie then issued a press release about the proposed termination.[2]

Brady's attorney subsequently asked Herb Hirst, a Health Division employee, for a continuance of the forthcoming meeting. Hirst responded that the meeting was being held as a courtesy and indicated that Brady would not be allowed to summon or subpoena witnesses.

The meeting was held in Gebbie's office on October 2, 1985 and was attended by Gebbie, Brady, Brady's attorneys, Dr. Harris, and Brady's wife. Gebbie asked Brady for specific information regarding whether he had used particular state-owned equipment when he performed private autopsies. Brady stated that in order to answer her questions he needed time to check his records. He asked for a continuance to gather the necessary information to outline his response to the charges. Gebbie denied the request. She also denied Brady's request for a fair and public hearing.

The next day, October 3, 1985, Gebbie discharged Brady. The letter of discharge stated as the reasons for Brady's termination the same charges as were contained in the earlier letter of suspension. Gebbie also issued a press release in which she

1. The money was intended as reimbursement for the costs involved in shipping pituitary glands that had been removed during autopsies and donated to the foundation.

2. Gebbie also included information about the concurrent proposed discharge for related charges of a colleague of Brady's, Dr. Larry Lewman. Dr. Lewman was retained, however, after he met with Gebbie.

stated, *inter alia,* that Brady, "through his systematic 16–year diversion of public funds" had "knowingly violated public trust and confidence." She further stated that "[t]rust and confidence in Oregon State Government cannot be restored if Dr. Brady continues to work."

Gebbie's press release also stated that the findings of a comprehensive investigation by the Attorney General revealed four major areas of violations that led to Brady's dismissal. Those areas were identified as: 1) establishing a private autopsy business that Brady conducted from the State Medical Examiner's Office—using state employees working at the state's expense —and depositing the payments received into his personal and private bank accounts; 2) collecting and depositing into his private bank accounts payments received from the federal government for private autopsies which Brady had performed for federal agencies, when such services should have been done by the state and at state expense; 3) diverting and placing into a private bank account $16,000 of the state's money and using it for "lunches, staff parties, coffee, and other items not authorized by state government regulations"; and 4) using state contracted laboratory services for Brady's private autopsy business while charging the state for them.

On October 4, 1985, Brady's attorney delivered to Gebbie a seven-page letter which detailed Brady's response to the charges. On October 21, 1985, Gebbie informed Brady's attorney by letter that her decision to terminate Brady was unchanged.

Brady subsequently filed suit in the United States District Court for the District of Oregon, pursuant to 42 U.S.C. § 1983, for monetary damages and reinstatement. Brady contended that in discharging him from public employment, Gebbie deprived him of his constitutionally protected property and liberty interests without due process of law. On November 4, 1986, the district court granted Gebbie's motion for partial summary judgment on the issue of reinstatement.

At the close of evidence, the court granted Gebbie's motion for a directed verdict on the property interest claims. The liberty interest claim was submitted to the jury, which returned a verdict in favor of Brady for $300,000. The court denied Gebbie's motions for JNOV, new trial, and remittitur. Gebbie timely appealed and Brady timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II.

Brady contends that the district court erred in directing a verdict for Gebbie on his property interest claim. He argues that, based on a mutual understanding or implied contract, he had a constitutionally protected property interest in his unclassified position as State Medical Examiner. He also argues that he had a statutorily created right to return to classified service after his discharge from unclassified service. We find Brady's arguments unpersuasive.

### A.

In determining the propriety of a directed verdict, this court has the same role as the court below. *Peterson v. Kennedy,* 771 F.2d 1244, 1256 (9th Cir.1985), *cert. denied* 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). A directed verdict is proper if, believing the evidence of the non-movant and drawing all justifiable inferences in his favor, there is only one reasonable conclusion as to the verdict. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *Peterson,* 771 F.2d at 1256. A district court's conclusions regarding state or federal law are reviewed de novo. *In Re McLinn,* 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).

### B.

The Fourteenth Amendment protects against the deprivation of property or liberty without procedural due process. *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978). Brady only has a constitutionally protected property interest in continued employment, however, if he has a reasonable expectation

or a "legitimate claim of entitlement" to it, rather than a mere "unilateral expectation." *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A legitimate claim of entitlement arises if it is created by "existing rules or understandings that stem from an independent source such as state law." *Id.* Thus "[s]tate law defines what is and what is not property" that is subject to the due process clause of the Fourteenth Amendment.[3] *Dorr v. County of Butte*, 795 F.2d 875, 876 (9th Cir.1986) (citing *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709). Brady therefore could only have a property interest in his job as State Medical Examiner if Oregon law created such a right.

A state law which limits the grounds upon which an employee may be discharged, such as conditioning dismissal on a finding of cause, creates a reasonable expectation of continued employment, and thus a protected property right. *Dorr*, 795 F.2d at 878. Where state employees serve at the will of the appointing authority, however, there is no such reasonable expectation of continued employment, and thus no property right. *Id.*

In Oregon, the statutory scheme divides state employees into two major categories of service: classified and unclassified.[4] *See* Or.Rev.Stat. §§ 240.195–240.210; *Papadopoulos v. Oregon State Bd. of Higher Educ.*, 14 Or.App. 130, 157, 511 P.2d 854,

867 (1973), *cert. denied,* 417 U.S. 919, 94 S.Ct. 2626, 41 L.Ed.2d 224 (1974). Employees who have successfully completed a statutory probationary period to become permanent or "regular" employees in classified service can only be fired for cause. Or.Rev.Stat. § 240.560(4); *Papadopoulos*, 14 Or.App. at 157, 511 P.2d at 867. State employees in unclassified service are "probationary"[5] or untenured, and thus have no job security. *Papadopoulos*, 14 Or. 157–58, 511 P.2d at 866–67. There is no statutory provision that employees in unclassified service can be fired only for cause. In fact, Or.Rev.Stat. § 240.240(1) provides that, with the exception of laws, rules and policies concerning salary and leave with pay,. the provisions of Chapter 240 of Oregon Laws—which include statutes mandating discharge for cause only as well as a right to a hearing—do not extend to employees in unclassified service.[6]

Under this scheme, only regular employees in classified service have a property right to continued employment. *Papadopoulos*, 14 Or.App. at 157–58, 511 P.2d at 867; *see also Simpson v. Western Graphics Corp.*, 53 Or.App. 205, 210, 631 P.2d 805, 808 (1981), *aff'd*, 293 Or. 96, 643 P.2d 1276 (1982) (property right is created by public employment when coupled with job protection). Employees in unclassified service can be discharged for any reason and have no right to a hearing. *Papadopou-*

---

**3.** Though state law creates a property interest, not all state-created rights rise to the level of a constitutionally protected interest. *See Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978) ("Although the underlying substantive right is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause.") (quoting *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. *Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972)).

**4.** The two other classifications are exempt and management service. *See* O.R.S. 240.200 and O.R.S. 240.212. We do not discuss either here since they are not at issue in Brady's case.

**5.** As used by the court in *Papadopoulos,* the term "probationary" employees includes both temporary probationary employees, i.e., employees who filled a classified position but had

not yet successfully completed the statutory probationary period, and permanent probationary employees, i.e., "public employes [who] are in positions for which no provision has been made for ever acquiring permanent job security." 14 Or.App. at 167–68, 511 P.2d at 871. Unclassified employees such as Brady fall within the latter category.

**6.** Or.Rev.Stat. § 240.240(1) provides:

The unclassified service ... shall not be subject to this chapter, except that employes and officers in the unclassified ... service shall be subject to the laws, rules and policies pertaining to any type of leave with pay except as otherwise provided in subsections (4) and (5) of this section, and shall be subject to the laws, rules and policies pertaining to salary plans except as otherwise provided in subsections (3) and (4) of this section. As amended, 1985 Or.Laws, ch. 121 § 1.

*los,* 14 Or.App. at 157–58, 167–68, 511 P.2d at 866–67, 871–72. They "have no property interest" in continued employment.[7] *Id.* 14 Or.App. at 157–58, 511 P.2d at 871–72.

Brady concedes that when he was discharged his position as State Medical Examiner was in the unclassified service. He admits that Or.Rev.Stat. § 240.240(1)—which governs employees in unclassified positions—does not contain language that such employees can be discharged either at will or only for cause. He argues, however, that the absence of these statutory provisions does not prohibit him from showing that he had a property interest created outside of the statute, i.e. by an implied contract or mutually explicit understanding that he would not be fired absent such cause. This argument lacks merit.

"[I]n Oregon, public employe tenure rights arise *solely* from statutes or ... regulations adopted pursuant to a statutory delegation of authority." *Papadopoulos,* 14 Or.App. 168, 511 P.2d at 872 (emphasis added). The court in *Papadopoulos* held that it is these rights, based on statute or regulation, which create property interests. *Id.*

The court ruled out the possibility that property interests for public employees in Oregon could arise solely from an implied or express contract of employment absent some underlying statute or regulation.[8] *Id.* at 168–69, 511 P.2d at 872. Therefore, even if Brady could show an implied contract of employment that he could only be fired for cause, he could not assert a property right based on that contract unless the contract was made pursuant to a statute or authorizing regulation. *See id.* Moreover,

though the court in *Papadopoulos* did not specifically address property rights arising from mutual understandings, the language of the opinion makes clear that Brady also could not show a property interest based on such a theory absent a showing of statutory authorization for Gebbie to enter into such an agreement.

Brady does not point to any such authority. Instead he merely argues that the absence of "at will" or "only for cause" language in Or.Rev.Stat. § 240.240 allows Gebbie to create an implied contract or a mutually explicit understanding. The statute, however, cannot be interpreted in isolation. *See Trivoli v. Multnomah County Rural Fire Protection Dist. No. 10,* 74 Or.App. 550, 555, 703 P.2d 285, 288 (1985) (refusing to interpret a statutory provision of state civil service code by reference to that section alone). Rather, it must be looked at with reference to the entire statutory scheme. *See id.* (reading provision concerning probationary employee in context with other provisions providing procedural protections to permanent employees).

It is clear from the entire statutory scheme governing Oregon state employees —i.e., Chapter 240—that the state intended that employees in classified service could not be discharged absent cause while employees in unclassified service, such as Brady, could be discharged at will. The state could have given unclassified employees such as Brady the same benefits as classified employees. *See Papadopoulos,* 14 Or. App. at 168, 511 P.2d at 872 n. 10. With the exception of salary plans and leave with pay provisions, however, it has not done so. *See* Or.Rev.Stat. § 240.240(1). Brady's reasoning would render this statutory scheme—and its distinctions between

---

7. An exception is made for employees who left classified service to take a job in the unclassified service and were subsequently discharged from their job in the unclassified service for reasons other than those set forth in Or.Rev. Stat. § 240.555. *See* Or.Rev.Stat. § 240.570 and discussion *infra* at II–C. Such employees have a right to return to classified service at the conclusion of their job in the unclassified service. *Id.* That right does not extend to employees such as Brady whose *position* has been moved from classified to unclassified service. *Id.*

8. Brady relies upon *Swanson v. Van Duyn Chocolate Shops, Inc.,* 282 Or. 491, 579 P.2d 239 (1978) and *Yartzoff v. Democrat–Herald Publishing Co., Inc.,* 281 Or. 651, 576 P.2d 356 (1978) for support. These cases only addressed implied contracts in the context of private employment; neither involved a state or public employee whose employment was governed by statutes. The reasoning in those cases is therefore not applicable to the instant case.

classified and unclassified employees—a nullity. *Cf. Trivoli*, 74 Or.App. at 554–55, 703 P.2d at 288 (in light of other statutory provisions, property interest in continued employment did not apply to probationary employee, despite statutory provision that appeared to hold otherwise).

Moreover, in 1977, the state moved the State Medical Examiner position from classified to unclassified service. In doing so it removed the protections associated with classified service, including the requirement that the state discharge employees holding positions in classified service only for cause. Allowing administrators such as Gebbie to make agreements with employees would defeat the state's reclassification of positions. It is not plausible that the state would give Gebbie implied power to enter into an understanding with Brady —as he argues—when the "understanding" would allow her to effectively overrule the legislature.

We therefore find that as a matter of Oregon law, Brady could not prevail on his claim of a property interest based on a mutual understanding or implied contract.[9]

### C.

■ We also find that Brady could not prevail on his contention that Or.Rev.Stat. § 240.570 gave him a property right to return to classified service after he was discharged from unclassified service.

At the time of Brady's discharge in 1985, Or.Rev.Stat. § 240.570 provided:

> Positions in the unclassified ... service[ ] may be filled by classified employes. After termination of unclassified ... service, for reasons other than specified by ORS 240.555, an employe formerly in the classified service shall be restored to a position in the same agency and in the same class as the position last held in the classified service. As amended, 1985 Or.Laws, ch. 121 § 3.

As Gebbie concedes, this statute creates a property right to return to classified ser-

vice. *See Alexander v. City of Menlo Park*, 787 F.2d 1371, 1374 (9th Cir.1986), *cert. denied*, 479 U.S. 1032, 107 S.Ct. 879, 93 L.Ed.2d 833 (1987) ("bumping" rights of employees are a constitutionally protected property interest). On its face, the statute applies to employees who have left a position in classified service to fill an existing position in unclassified service.

Brady contends that under the plain language of the statute, it also applies to persons whose *position* has been reclassified, i.e. moved from classified to unclassified service. If anything, however, the statutory language that "positions in the unclassified service ... may be filled by classified employees" appears to exclude employees like Brady, who filled a position the legislature has removed from classified and placed in unclassified service. Moreover, the legislative history of Or.Rev.Stat. § 240.570, when read in conjunction with another statute which was repealed in 1979 —Or.Rev.Stat. § 240.572—supports this interpretation.

In 1977, the Oregon legislature moved a number of positions from classified to unclassified service. At the same time, the legislature enacted Or.Rev.Stat. § 240.572, which provided

> An employe whose position is placed in the unclassified service pursuant to section 1 of this 1977 Act shall, after termination of service in the unclassified position, be restored to his or her status in the classified service in accordance with rules adopted by the division. 1977 Or. Laws, ch. 271 § 3.

At that time, Or.Rev.Stat. § 240.570 provided:

> Positions in the unclassified ... service may be filled by classified employes upon request of the appointing authority. Any classified employe so appointed shall, after termination of service in an unclassified or exempt position, be re-

---

**9.** Brady also argues that the district court erred in holding that a directed verdict was also proper since Brady did not present sufficient evidence of a mutual understanding. Because we hold that a mutual understanding claim was not available to Brady, we need not address this additional argument.

stored to his status in the classified service. *See* 1955 Or.Laws, ch. 738 § 6.

Both Or.Rev.Stat. §§ 240.570 and 240.572 created a right to return to classified service for employees whose unclassified service was terminated. They applied, however, to different circumstances. Or.Rev. Stat. § 240.570 applied to employees who had left a position in classified service to fill an existing unclassified position, while Or.Rev.Stat. § 240.572 applied to employees whose position had been moved from the classified to the unclassified service. *See Fajer v. Dept. of Human Resources,* 51 Or.App. 105, 110, 625 P.2d 140, 142–43, *rev. denied,* 291 Or. 151, 634 P.2d 1345 (1981) (noting differences between situations covered under Or.Rev.Stat. §§ 240.- 570 and 240.572). Thus, a state employee like Brady whose position had been moved from classified to unclassified service, fell within Or.Rev.Stat. § 240.572 and not § 240.570.

In 1979, the legislature repealed Or.Rev. Stat. § 240.572. *See* 1979 Or.Laws, ch. 468 § 1. It also amended Or.Rev.Stat. § 240.570. *See* 1979 Or.Laws, ch. 468 § 18. The amendment to Or.Rev.Stat. § 240.570, however, did not add any language similar to that contained in Or.Rev.Stat. § 240.572, but kept intact its former language that "positions in the unclassified ... service may be filled by classified employes." Thus, even after the amendment, Or.Rev. Stat. § 240.570 still did not cover employees such as Brady whose *position* had been moved from classified to unclassified service, i.e. those employees in circumstances formally protected by Or.Rev.Stat. § 240.572. Since only Or.Rev.Stat. § 240.570 was in effect when Brady filed his lawsuit—and since it did not apply to Brady—his argument that he had a statutorily created property right to return to classified service after his discharge from unclassified service is without merit.

### D.

Thus, as a matter of Oregon law, Brady did not have a constitutionally protected property interest in his unclassified position as State Medical Examiner and did not have a statutorily created right to return to classified service after his discharge. The district court therefore did not err in directing a verdict for Gebbie on Brady's property interest claim.

### III.

■ Brady also argues that the district court erred in granting Gebbie's motion for summary judgment on the issue of whether Brady was entitled to seek reinstatement. Brady does not argue that there were material issues of fact that should have gone to a jury on this issue. Rather, he contends that the district court erred in holding, as a matter of law, that reinstatement was not an appropriate remedy for a due process violation.

### A.

A district court's grant of summary judgment is reviewed de novo. *San Bernardino Physicians' Services Medical Group, Inc. v. County of San Bernardino,* 825 F.2d 1404, 1407 (9th Cir.1987). Summary judgment is proper if the record, viewed in the light most favorable to the non-moving party, shows that no genuine issues of material fact exist and that the moving party was entitled to judgment as a matter of law. *Id.* The district court's interpretation of state and federal law is also reviewed de novo. *Id.*

### B.

This court and the Supreme Court have repeatedly held that the appropriate remedy for deprivation of a liberty and/or property interest without due process is to order the process that was due and any attendant damages which directly resulted from the failure to give the proper procedure. *Vanelli v. Reynolds School Dist. No. 7,* 667 F.2d 773, 778 n. 8 (9th Cir.1982); *see also Carey v. Piphus,* 435 U.S. at 259– 64, 98 S.Ct. at 1051–52; *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977) ("remedy mandated by the Due Process Clause of the Fourteenth Amendment" for claim based on stigmatization during discharge from employment

**1552**

is a name-clearing hearing); *Roth,* 408 U.S. at 573, 92 S.Ct. at 2707. Brady contends, however, that this court has also found that in certain circumstances, reinstatement might be appropriate for deprivation of property without due process. He cites to *Burton v. Cascade School Dist. Union High School No. 5,* 512 F.2d 850 (9th Cir.), *cert. denied,* 423 U.S. 839, 96 S.Ct. 69, 46 L.Ed.2d 59 (1975), and *Cain v. McQueen,* 580 F.2d 1001 (9th Cir.1978), for support. His reliance on those cases, however, is misplaced.

■ Unlike Brady's case, both *Cain* and *Burton* involved an undercurrent of first amendment claims intertwined with a due process claim. *See Cain,* 580 F.2d at 1005 (plaintiff alleged that she had been fired in part for speaking out; thus, her claim was "strikingly similar" to cases involving First Amendment claims); *Burton,* 512 F.2d at 851 (statute under which a teacher was fired was held by the district court to be unconstitutionally vague). We agree with these cases that there may be a right to reinstatement when another substantive right coexists with the right to procedural due process. *See Burton,* 512 F.2d at 853 & n. 3 (noting that the "extraordinary equitable remedy" of reinstatement has been imposed in situations involving the legal exercise of free expression or racial discrimination). Brady, however, has not alleged another such right, but solely alleged his right to due process. We refuse to adopt his argument that reinstatement is an available remedy in such a case. *Burton* and *Cain* do not require us to do otherwise. The district court therefore did not err in ruling that reinstatement was not an available remedy for his claims and granting partial summary judgment to Gebbie on this issue.

### IV.

The district court did not state the grounds for its denial of Gebbie's motion for a directed verdict or JNOV on Brady's claim that Gebbie deprived him of liberty without due process. Gebbie argues that the district court erred in denying her motion because an at-will employee such as

Brady cannot have a liberty interest implicated in the context of termination from employment. She also argues that, based on the evidence, Brady could not show that she deprived him of a liberty interest that was protected by the due process clause. In the alternative, Gebbie contends that she gave Brady all of the process that he was due. We do not find any of these arguments to be persuasive.

### A.

A denial or grant of a motion for JNOV is reviewed under the same standard as a directed verdict, i.e. "whether the evidence, viewed in the light most favorable to the non-moving party, permits only one reasonable conclusion with respect to the verdict." *Locricchio v. Legal Services Corp.,* 833 F.2d 1352, 1356 (9th Cir.1987). A directed verdict is not appropriate if there is substantial evidence to support a verdict for the non-moving party. *Peterson,* 771 F.2d at 1256.

### B.

■ "[A] liberty interest is implicated in the employment termination context if the charge impairs a reputation for honesty or morality." *Matthews v. Harney County, Or., School Dist. No. 4,* 819 F.2d 889, 891 (9th Cir.1987). In order to trigger the procedural protections of due process attendant to a properly presented liberty interest claim, a plaintiff must show that "1) the accuracy of the charge is contested; 2) there is some public disclosure of the charge; and 3) the charge is made in connection with termination of employment." *Id.* at 891–92; *see also Jones v. Los Angeles Community College Dist.,* 702 F.2d 203, 206 (9th Cir.1983); *Vanelli,* 667 F.2d at 777–78. All of these elements were included in the instructions given to the jury in Brady's case. The jury also was told explicitly that it had to find that the charges against Brady were false.

Gebbie first contends that, since Dr. Brady's position was in the unclassified service, he was an at-will employee. She then argues that no liberty interest could be

implicated—and no hearing is necessary—when an at-will employee is stigmatized during the course of discharge from employment. Thus she argues that Brady has not been deprived of a liberty interest and is not entitled to due process even if he was stigmatized in the course of termination from his job as State Medical Examiner. This argument is without merit.

Gebbie relies on *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), for support. The Court in *Paul,* however, only held that reputation alone "apart from some more tangible interests such as employment" is not a liberty interest. *Id.* at 701, 96 S.Ct. at 1161. It never even discussed limits on the rights of an at-will employee to assert a liberty interest claim.

Moreover, subsequent cases from the Supreme Court and this circuit have held that a nontenured government employee has a liberty interest and is entitled to a name-clearing hearing "if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination." *Codd,* 429 U.S. at 628, 97 S.Ct. at 884; *see also Fleisher v. City of Signal Hill,* 829 F.2d 1491, 1495 (9th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). Thus, while Brady's position in the unclassified service—or his at-will employment—bars his property claim, as discussed *supra,* it does not preclude his liberty claim. *See Loehr v. Ventura County Community College Dist.,* 743 F.2d 1310, 1317 (9th Cir.1984) (failure to prevail on property claim will not preclude a properly asserted liberty claim).

Gebbie's other argument, i.e., that no reasonable jury could have found for Brady on the liberty interest issue, is equally without merit. Based on the evidence presented at trial, the jury could reasonably have found that Brady's discharge by Gebbie implicated a liberty interest, and that Brady was entitled to procedural due process.

Brady presented undisputed evidence that Gebbie charged him with 1) violating the public trust, 2) diverting state funds for his own use, 3) establishing a "slush fund", 4) causing the state to be billed for toxicological reports made in connection with private autopsies he performed, and 5) causing the federal government to be billed instead of the state government. These charges involved accusations of dishonesty which were sufficient to implicate a liberty interest. *See Orloff v. Cleland,* 708 F.2d 372, 378 (9th Cir.1983) (charges that government physician received payment for services he did not render, made in connection with termination of employment, rise to level of implicating a liberty interest).

In addition, there was sufficient evidence presented from which a jury could reasonably infer that the charges were both contested and false. Brady testified that he contested the charges contained in his letter of termination. He also stated that the money in the so-called "slush fund" was used for state and not private purposes and the fund was openly kept. In addition, Brady testified that he instructed his secretaries to type up his autopsies on their own time, did not cause the state to be billed for toxicology reports performed in connection with his private autopsies, and billed the federal government for autopsies done on certain federal cases because they were done under the federal government's jurisdiction.

There also was testimony from Brady's colleague, Dr. Lewman, that he had also performed private autopsies, that no one had informed him—nor was he aware—that the practice would violate conflict of interest rules, and that the staff was instructed to write up private autopsy reports on their own time. Dr. Lewman also testified that there was no advantage to billing toxicological reports from private autopsies to the state as it would ordinarily be billed to the party for whom the service was performed, and that Brady had never arranged for the state to be billed for such reports. Another witness, Dr. Krasselt, testified that the toxicology billings could have resulted from inadvertent error. Based on this evidence alone, a jury could rationally infer that at least some—if not all—of the charges against Brady were false.

A jury could also reasonably find that the charges were published by Gebbie and made in the course of Brady's termination from employment. There was uncontroverted evidence that Gebbie made these charges against Brady in connection with his suspension without pay and his discharge, and that she included these charges in press releases and statements made to the press.

Thus, there was evidence from which a jury could reasonably infer that Gebbie 1) charged Brady with conduct that impaired his reputation for honesty; 2) publicly disclosed the charges; and 3) the charges were in connection with Brady's termination from employment. *Matthews*, 819 F.2d at 891–92. Since there was evidence presented from which a reasonable jury could find that Gebbie deprived him of a constitutionally protected liberty interest, and since Brady's status as an unclassified employee did not preclude his asserting a liberty claim, the district court did not err in denying Gebbie's motions for a directed verdict and JNOV on this issue.

### C.

■ The district court also did not err in refusing to direct a verdict for Gebbie on her claim that even if she deprived Brady of a liberty interest, she gave him all the process that was due.

As Gebbie concedes, the fundamental requirement of due process is an opportunity to be heard at a meaningful time and in a meaningful manner. *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976). At a minimum, due process requires notice and a hearing where the individual has a meaningful opportunity to confront the evidence against him. *Vanelli*, 667 F.2d at 780. To deter-

mine what process is due in an individual case—and if it is due before or after the deprivation of a constitutionally protected interest—a court must apply the three-part test set out in *Mathews v. Eldridge,* 424 U.S. at 334–35, 96 S.Ct. at 902. That test balances 1) the private interest that will be affected, 2) the risk of an erroneous deprivation of that interest through the procedures used, and 3) the additional cost and administrative burdens that additional procedures would entail. *Id.* Thus, although a hearing where the individual has an opportunity to rebut the charges against him is always required in due process cases, when the hearing must be held and what procedural protections must be given at the hearing are determined on a case-by-case basis.

Where a person has been deprived of a liberty interest without due process, the hearing required must provide the aggrieved party with an opportunity to clear his name.[10] *Codd,* 429 U.S. at 627, 97 S.Ct. at 884. There was sufficient evidence presented in the instant case from which a jury could reasonably find that Gebbie did not give Brady even minimal due process, i.e. an opportunity to be heard in a meaningful manner or an opportunity to clear his name. A jury could reasonably infer that even if the October 2, 1985 meeting constituted a "hearing," it did not comport with due process.

Brady testified that on September 21, 1985—prior to the time Gebbie handed him the letter of "proposed" discharge—Gebbie told him "I don't know what in heaven's name you can tell me, Bill, that would make me change my mind." Dr. Harris, who was present at that meeting, also testified that Gebbie told him "I can't conceive

---

**10.** The jury in Brady's case was given instructions in accordance with all of these principles. It was instructed that Brady had to prove that he was in fact denied an opportunity to clear his name through notice and a hearing. It was also instructed that:

> Due process requires a fair hearing. The minimum, there must be an opportunity to be heard at a meaningful time and in a meaningful manner. There is no rigid requirements as to the type of hearing a person is entitled.

> The nature of the hearing which must be provided depends upon the circumstances of the particular case. The factors to be considered include the private interest that will be affected—that will be the interest of the plaintiff Brady, the risk of erroneous deprivation of that interest through the procedures used and the physical and administrative burdens that any additional procedure requirements would entail.

No objections were made to the instructions.

of what the reasons will be" in reference to Brady's possible response to the charges. Hoevet testified that he saw Gebbie on a television news program prior to the October 2, 1985 meeting, at which time Gebbie said she couldn't think of what would make her change her mind about terminating Brady. He also testified that prior to the October 2, 1985 meeting, Gebbie wrote a letter to another doctor in which she stated that she had fired Brady. A jury could reasonably infer from this evidence that Gebbie had made up her mind about Brady before the meeting and would have disregarded any evidence which Brady presented in mitigation or rebuttal.

Moreover, there was sufficient evidence presented from which a jury could reasonably infer that Gebbie did not allow Brady sufficient time to prepare for the meeting, and thus did not give him a "meaningful" opportunity to respond to the charges. Several witnesses testified regarding Gebbie's repeated refusal of requests for a continuance of the October 2, 1985 meeting. Hoevet testified that prior to the meeting he had asked Hirst for a continuance, and that the request was refused on September 30, 1985 by one of Gebbie's aides. Dr. Harris testified that he and a group of pathologists had tried to get both a hearing for Brady and a delay of the meeting. Snyder testified that on the day of the meeting she also requested a delay. In addition, both Harris and Snyder gave testimony that Gebbie had asked specific questions at the October 2, 1985 meeting as to whether Brady had used particular pieces of equipment for private autopsies, and that she had refused Brady's request for a continuance to have time to check his records. A jury could infer from this that the "hearing" was a mere formality and that Gebbie did not give Brady a "meaningful opportunity" to clear his name or be heard. *See Matthews*, 819 F.2d at 893–94 ("[d]ue process of law [is not present] where the state has gone through the mechanics of providing a hearing, but the

hearing is totally devoid of a meaningful opportunity to be heard") (quoting *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir.1987)).

The jury could also reasonably infer from the scheduling of the meeting just one week after Brady received the letter of proposed termination, the lack of almost any formal procedures, the setting of the meeting (i.e. Gebbie's office), Hirst's comments regarding witnesses, and Gebbie's persistent refusal to grant a continuance or allow Brady sufficient time to gather evidence to refute the charges, "that the sequence of events rendered the [meeting] meaningless as a pre-termination opportunity to respond." *Matthews*, 819 F.2d at 893. When coupled with the fact that this was the *only* hearing given to Brady—i.e., he was given no post-termination procedures—a jury could have reasonably concluded that Brady had no "opportunity to be heard at a meaningful time and in a meaningful manner" and thus was denied even minimal due process. Thus the district court did not err in denying Gebbie's motion for a directed verdict on this issue.[11]

## V.

◼ Gebbie also argues that a directed verdict was appropriate on Brady's liberty interest claim since, even if Brady was entitled to more process than he was given, Gebbie is entitled to qualified immunity from Brady's lawsuit. Government officials who perform discretionary functions are generally given qualified immunity from civil damage suits so long as the conduct of the officials "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Schwartzman v. Valenzuela*, 846 F.2d 1209, 1211 (9th Cir. 1988); *Ostlund v. Bobb*, 825 F.2d 1371, 1374 (9th Cir.1987), *cert. denied,* —— U.S.

---

11. There was also sufficient evidence from which a jury could reasonably infer that—based on an application of the *Mathews v. Eldridge* factors, Brady was entitled to *more* than the

minimum procedures. We need not address this issue, though, since we find Brady did not get even the minimum process required.

——, 108 S.Ct. 2016, 100 L.Ed.2d 603 (1988).

In determining whether the law was clearly established, the contours of the right alleged to have been violated "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Schwartzman*, 846 F.2d at 1211. This requires more than an alleged "violation of extremely abstract rights." *Anderson*, 107 S.Ct. at 3038–39; *Schwartzman*, 846 F.2d at 1211. The action in question, however, need not be previously held unlawful. *Anderson*, 107 S.Ct. at 3039; *see also Ostlund*, 825 F.2d at 1374 (specific binding precedent is not required to find that law is clearly established for purposes of qualified immunity analysis). Rather, the unlawfulness must be apparent in light of preexisting law. *Anderson*, 107 S.Ct. at 3039; *Schwartzman*, 846 F.2d at 1211.

Whether at the time of the challenged action the legal norm allegedly violated by an official was clearly established is a question of law. *Mitchell v. Forsyth*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Whether a reasonable official would know that she is violating that clearly established law is a question for the jury. *Schlegel v. Bebout*, 841 F.2d 937, 945 (9th Cir.1988); *see also Bilbrey by Bilbrey v. Brown*, 738 F.2d 1462, 1467 (9th Cir. 1984) (existence of a reasonable belief that official's act is lawful in light of clearly established law is a question for the trier of fact).

The district court did not state the grounds for its refusal to direct a verdict for Gebbie based on the defense of qualified immunity. By denying Gebbie's motion, however, the district court necessarily found that the legal rules were clearly established in this area and that the jury could reasonably find that a reasonable official in Gebbie's position would know that her conduct was in violation of Brady's clearly established constitutional rights.

Gebbie argues that it was error for the district court to deny her motion for a directed verdict on the issue of qualified immunity because the law was not clearly established that Brady had a right to a liberty interest hearing or that the procedures given to Brady did not meet the constitutional requirements of due process.[12]

At the time Gebbie acted in 1985 the law was clearly established that: 1) a liberty interest was implicated when an employee was stigmatized by charges of immoral or dishonest conduct made in the context of discharge from employment, *see Jones*, 702 F.2d at 206; *Vanelli*, 667 F.2d at 777; 2) the due process clause was triggered in such a case if the accuracy of the charge was disputed, the charge was publicly disclosed, and the charge was made in connection with termination of employment, *see Jones*, 702 F.2d at 206; *Vanelli* 667 F.2d at 777–78; 3) the fundamental requirement of due process was the opportunity to be heard at a meaningful time and in a meaningful manner, *Mathews*, 424 U.S. at 333, 96 S.Ct. at 902; *Orloff*, 708 F.2d at 379; *Vanelli*, 667 F.2d at 779–80; and 4) the minimum process due for deprivation of a liberty interest involving stigmatization during termination of employment was a hearing where the employee has an opportunity to clear his name, *Codd*, 429 U.S. at 627, 97 S.Ct. at 884. The law was also clearly established that what process is due in any case is determined by application of the three-pronged test in *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903 (balancing the private interest that will be affected, the risk of an erroneous deprivation of that interest through the procedures used, and the additional cost and administrative burdens that additional procedures would entail); *see also Orloff*, 708 F.2d at 379.

**12.** Gebbie did object at trial to the instruction on qualified immunity which was given to the jury. She only objected, however, on the grounds that the judge should have told the jury that qualified immunity had both a subjective and objective component. Gebbie's objection was therefore based on an incorrect interpretation of the law, since *Harlow* only allows an objective test.

■ Gebbie argues that the law was not clearly established as to the exact procedures due in Brady's case. Specific binding precedent is not required to show that a right is clearly established for qualified immunity purposes. *Ostlund,* 825 F.2d at 1374. Based on the aforementioned preexisting law, the unlawfulness of Gebbie's actions would have been apparent. *See id.* The district court thus did not err in its implicit conclusion that the law was clearly established for purposes of Gebbie's qualified immunity defense.

Gebbie also implies that her actions were reasonable in light of the established law. There was sufficient evidence presented, however, from which a jury could reasonably infer that a reasonable official would know that Brady had a liberty interest that triggered the due process clause and that Gebbie's conduct was violating Brady's constitutional right to the minimum process. *See* discussion, *supra.* The district court thus did not err in denying Gebbie's motion for a directed verdict based on her qualified immunity defense.

### VI.

■ We decline to address Gebbie's contention that Brady was not deprived of a liberty interest because Gebbie's statements regarding him were all absolutely privileged. Gebbie first raised this issue on appeal at oral argument.[13]

Under Fed.R.App.P. 28(a)(4), the appellant's brief must contain "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Gebbie did not even mention—much less argue—the issue of absolute privilege in either her opening or reply brief.[14] We therefore deem it waived. *See Northwest Acceptance v. Lynnwood Equipment,* 841 F.2d 918, 924 (9th Cir.1988) (appellants' contention waived because of their failure to provide adequate argument in their opening brief).

### VII.

■ Gebbie lastly argues that the district court erred in not granting her motion for JNOV or remittitur on the damages issue. The purpose of awarding damages in a section 1983 case is to compensate the aggrieved party. *Carey,* 435 U.S. at 254–55, 98 S.Ct. at 1047–48. The compensable damages are those actually caused by the denial of procedural due process. *Chalmers v. City of Los Angeles,* 762 F.2d 753, 761 (9th Cir.1985). These can include damages for mental and emotional distress. *Vanelli,* 667 F.2d at 781.

This court "will not disturb an award of damages on appeal unless it is clearly unsupported by the evidence." *Chalmers,* 762 F.2d at 760. "An otherwise supportable verdict must be affirmed unless it is 'grossly excessive' or 'monstrous' or 'shocking to the conscience.'" *Id.* (quoting *Fountila v. Carter,* 571 F.2d 487, 492 (9th Cir.1978)). Thus, the jury's award of $300,000 damages to Brady should not be overturned or decreased unless it is clearly

---

**13.** At the time of oral argument, Gebbie also filed, pursuant to Fed.R.App.P. 28(j), a letter of "supplemental authorities" to support her absolute privilege argument. Rule 28(j), however, provides

> When pertinent and significant authorities come to the attention of a party after the party's brief has been filed, or after oral argument but before decision, a party may promptly advise the clerk of the court ... setting forth the citations.

Gebbie included the issue of absolute privilege in the pretrial order and argued it in her trial memorandum. That memorandum included citations to two of the four authorities that were listed in the letter of supplemental authorities. Thus, these authorities could hardly have first

come to Gebbie's attention *after* her briefs were filed or after oral argument, as is required under Rule 28(j).

It thus appears that Gebbie either simply neglected to include her absolute immunity argument in her briefs or chose to exclude it. In either case, we will not sanction her using Rule 28(j) to alter the situation and raise an issue that has not been briefed—especially when she was aware of the issue as early as the pretrial stage. We thus decline to consider these authorities.

**14.** Moreover, though she discussed it in the pretrial order and her trial memorandum, Gebbie did not raise the issue of absolute privilege in her motions for a directed verdict, JNOV, or new trial.

unsupported by the evidence or "shocks the conscience."

 There was ample testimony by both Brady and his psychiatrist, Dr. Morgenstern, to show the emotional distress and psychological damages Brady suffered and the nexus between these injuries and the deprivation of due process. Dr. Morgenstern testified that Brady was completely preoccupied by his employment problems and anxious that he would not be able to tell his side of the story. He described a steady worsening of Brady's symptoms over the period from the time of Brady's suspension to several months before trial. Those symptoms included severe and malignant insomnia, anxiety, suicidal fantasies, quiet and severe depression and anxiety. Dr. Morgenstern also testified that Brady suffered from permanent psychological damage and would require treatment for several years. He stated that the failure to get a hearing and the conditions surrounding the termination were the cause of Brady's condition. In addition, Brady described sleeping difficulties, frustration, and emotional upset which resulted because nobody would hear his side of the story. This evidence is sufficient to show compensable psychological harm. *Cf Chalmers,* 762 F.2d at 761 (court found plaintiff's testimony that she suffered humiliation, embarrassment and anxiety was by itself sufficient proof of compensable psychological harm to uphold damages award).

Brady also presented evidence that he lost employment opportunities as an expert witness. Numerous professionals in the legal, academic, and medical field testified that Brady's reputation was tarnished and his usefulness as an expert witness diminished due to his discharge. Two witnesses who had used Brady as an expert witness in the past—a former U.S. Attorney in Washington and the Solicitor General in Idaho—gave testimony that indicated they and the two government offices with which they were associated at the time Brady was discharged would be unlikely to use Brady again.

Gebbie contends that the damages award was not supported by the evidence because only one of her published statements regarding Brady was "arguably inaccurate" and the harm Brady suffered was due to adverse publicity from other sources;[15] Brady's psychiatric problems started before she made any statements; there was no nexus between her one "inaccurate" statement and Brady's psychiatric problems; and there was no showing of lost business opportunities or basis for lost future income. As discussed previously, there was evidence presented at trial to refute all of these contentions. Gebbie's argument thus boils down to a contention that the jury made an error when it weighed the evidence. "[W]e do not account for witness credibility, weigh evidence, or reach a different result simply because we feel it is more reasonable." *Locricchio,* 833 F.2d at 1356. The jury award in Brady's case was not clearly unsupported by the evidence or "shocking to the conscience." The district court was correct in denying Gebbie's motion for JNOV or remittitur.

## VIII.

We therefore affirm the decision of the district court on all of the issues.

---

**15.** As discussed *supra,* Brady disputed all of the charges contained in his letter of termination and many statements in the press releases. There was sufficient evidence from which a jury could infer some or all of the statements were false. Moreover, the jury was instructed that

> [t]he publication of any stigmatizing matter which was not the result of defendant's conduct is not to be attributed to her.

> In this regard evidence showing third parties published stigmatizing information cannot form the basis of liability against [Gebbie]....

It is thus unlikely that the jury based its award on one "inaccurate" remark, or that it considered statements made by third parties in assessing the damages.