789 F.Supp. 989 (1992)
Mitchell SHANDS, Don Key, and Forrest Busch, Plaintiffs,
v.
CITY OF KENNETT, Warren Karsten, John Mallott, Jerry Talley, John Vardell and Jingo Cole, Defendants.
No. S 89-0088 C.
United States District Court, E.D. Missouri, Southeastern Division.
March 19, 1992.
*990 Jim R. Bruce, Kennett, Mo., for plaintiffs.
Stephen P. Sokoloff, Sharp & Sokoloff, Kennett, Mo., for all defendants.
Mark J. Pelts, Pelts, Stokley & Turnbow, Kennett, Mo., for defendants Karsten and Mallott.

JUDGMENT
LIMBAUGH, District Judge.
On April 10, 1989, plaintiffs were terminated as volunteer fire fighters for the City of Kennett, Dunklin County, Missouri. On June 1, 1989, plaintiffs filed suit against all defendants requesting damages arising from the termination and for a variety of other kinds of relief. Various allegations of liability were set out in the complaint.
The case was tried to a jury and after verdicts, judgment on November 30, 1991 was entered in favor of plaintiff Mitchell Shands against defendants for actual damages in the sum of Four Thousand Five Hundred and no/100 Dollars ($4,500.00) together with punitive damages in the sum of Fifty Thousand and no/100 Dollars ($50,000.00).
Judgment was also entered in favor of plaintiff Don Key against defendants for actual damages in the sum of Seven Thousand Three Hundred and no/100 Dollars ($7,300.00) and punitive damages in the sum of Seventy-Five Thousand and no/100 Dollars ($75,000.00).
Judgment awarding actual damages in favor of Forrest Busch against all defendants was also entered in the sum of Five Thousand and no/100 Dollars ($5,000.00) together with an additional sum of Fifty Thousand and no/100 Dollars ($50,000.00) as punitive damages.
Several matters are before the Court. The first is the request of all plaintiffs for reinstatement as fire fighters for the City of Kennett on a volunteer basis.
The second is for attorney fees, costs and other relief to which the plaintiffs may be entitled.
Defendants have requested a new trial or in the alternative for judgment notwithstanding the verdict.
After reviewing the file and the motion for a new trial, and response thereto by plaintiffs, the Court determines that there was no prejudicial error committed in the trial of the case, and accordingly, the request for a new trial should be denied.
The Court next considers the motion of all defendants for judgment notwithstanding the verdict. In considering the defendants' motion for JNOV, the Court must give great credence to the jury verdict, giving it the benefit of all reasonable inferences and taking all the evidence tending to support the verdict. In order to sustain a motion for JNOV for the defendants, all the evidence must point one way, in their favor, and it must not be susceptible to any reasonable inferences supporting the jury's verdict. Rellergert v. Cape Girardeau County, Missouri, 924 F.2d 794, 797 (8th Cir.1991), aff. 724 F.Supp. 662 (E.D.Mo.1989). Nonetheless, in order to sustain the verdict, it must be supported by substantial evidence and a mere scintilla is not enough. Singer Co. v. E.I. du Pont, de Nemours and Co., 579 F.2d 433, 440 (8th Cir.1978).
With this standard in mind, we review the evidence. The City of Kennett is the county seat of Dunklin County, Missouri, located in the Southern portion of the Bootheel. Although a few full-time fire fighters formed a nucleus for fire protection, most of the Kennett fire department was composed of volunteers. During the time in issue, there were seven full-time *991 fire fighters and 24 volunteers for a total of 31. Even though the 24 volunteers were called volunteer fire fighters, they received $10.00 pay per fire call, irrespective of the seriousness of the fire. They also received $10.00 for every training session which they attended. The volunteer fire fighters ranged from attending 60% to 95% of the fires.
There are generally 140 to 160 fire calls annually and 24 training sessions; thus, if a fire fighter answered 130 calls per year and attended 20 meetings, he would receive annually the sum of $1,500.00 remuneration from the City.
Bill McMahan was the fire chief from 1980 to the end of 1988. In 1986, in addition to the fire chief, there were two captains and in 1988, rather than two captains, there was one captain and an assistant chief.
Kennett operates under Missouri law with a mayor/council style of government, and the members of the council are elected and assigned to oversee certain committees. There was a fire committee which was in existence in 1988 and 1989. The committee was composed of three members of the council with defendant Jerry Talley being the chairman, and defendants John Vardell and Jerry Repstock being the other members. Although Repstock was originally named as a defendant, he died May 14, 1990, purportedly from causes not related to this case, and his name was removed as a party-defendant.
The fire committee generally handled all of the affairs of the fire department and their actions and recommendations usually were approved by the City Council. Some of the witnesses testified that there was an internal power struggle going on over the years between the fire fighters and the fire committee, and the City Council. Other witnesses denied this type of power struggle.
In late 1988, the fire committee, on its own, determined that the fire department needed upgrading and in order to do this, the committee felt that the department should have a professional, full-time fire chief. In October of 1988, advertisements for a chief were published and defendant John Mallott, a non-Kennett resident, was hired by the fire committee. Mallott had substantial experience as a professional firefighter and before January 1, 1989 was a full-time fire fighter for the City of Sikeston, Scott County, Missouri.
Five persons on the existing fire fighting staff had applied for the job, as did others, and following the hiring of defendant Mallott there was substantial concern expressed among the fire fighters. The fire fighters were irritated because they were not consulted by the fire committee concerning the new organization and the method of selection of a new fire chief. There were several meetings and plaintiffs and others threatened to resign. At one time, a substantial walkout was considered but on reflection and reevaluation by plaintiffs and others, the walkout was averted.
Defendant Mallott took over his duties January 2, 1989, and reorganized the force to some extent. He appointed an assistant chief, two captains and five lieutenants, all from the existing staff. Some of the five persons on the staff who had applied for Mallott's job filled the position of captain or lieutenant.
During January, February and March of 1989, Mallott began to acquire fire-fighting equipment from surplus commodities. Apparently, the items were acquired for a reasonable sum or by gift, and some may have been used equipment. There was apparently little or no communication between Chief Mallott and the fire fighters with respect to these acquisitions. At various meetings, the fire fighters expressed concern over the Chief's practice as they felt that some of the equipment the Chief had acquired was not safe or was outmoded.
In addition, the fire fighters were concerned about the lack of an expert on the force who could be available during a fire to disconnect electric meters. Many of the men felt that an electrician or a fire fighter, trained in this type of work, should be employed, so that if electricity was ever a problem during a fire, it could be resolved by having the expert available. Apparently, *992 there was not a great deal of conversation, if any, concerning all of these matters between the Chief and the men.
David Horton had been a volunteer fire fighter for the City of Kennett between the years 1982 and 1986. He resigned in 1986 because he was somewhat disenchanted with the department operation. After Chief Mallott was employed, Horton changed his mind and felt that he would like to be reinstated as a volunteer fire fighter. He submitted an application to Chief Mallott who indicated an interest in reinstating Horton. Sometime in March 1989, Chief Mallott issued a formal request to the council to reinstate Horton as a volunteer fire fighter. The plaintiffs and other fire fighters became aware of Horton's application and submission to the council and discussed it at various times.
Following these discussions, plaintiff Busch met for breakfast with one of the councilmen, Bill Wilson, as they were friends. The meeting occurred at McCormick's Steak House on March 31, 1989. There is some question as to whether anyone else was present other than Busch and Wilson.
At the breakfast, Busch discussed with Wilson the application of David Horton for reinstatement. Busch testified that he told Wilson that the employment of Horton should be postponed because additional time was needed to consider various safety features such as the recent equipment purchases by the Chief and the need to have someone disconnect meters at all fires. Accordingly, Busch requested that at the council meeting Wilson move to table the application of David Horton for a limited period of time. Wilson testified that at the meeting, Busch asked him to table because they had been having problems with David Horton.
In any event, Wilson agreed to move to table Horton's application, but suggested to Busch that he should contact another councilman for the purpose of having a "second" to the motion. The next day, Saturday, April 1, 1989, many of the fire fighters met at the fire station for breakfast which they did occasionally. Perhaps 21 or 22 fire fighters were present including all plaintiffs and Bob Holder, another volunteer fire fighter. At the meeting, there was a general discussion about the acquisition of the surplus equipment and the need to have someone available to disconnect meters at fires and also the application of David Horton for reinstatement. Busch indicated that he had discussed the matter with councilman Wilson who had agreed to move to table the application of Horton when it was to be presented at the next council meeting. Considerable discussion was had as to obtaining another councilman to "second" the motion to table.
Plaintiff Key suggested that councilman Cole was his friend and that they should contact him about "seconding" Wilson's potential motion. Busch also indicated that he was a friend of Cole and several persons decided to visit Cole to discuss the matter with him.
After breakfast on April 1, 1989, all of the plaintiffs and Bob Holder went to see Cole at his Kennett place of business. They talked with him about fire department affairs, and reiterated their concern about safety, the acquisition of the surplus equipment, the need to have someone on the force available to disconnect electric meters at a fire, and the pending application of David Horton.
Plaintiff Key told Cole that councilman Wilson had agreed to move to table the Horton application for two weeks, and indicated that they needed a "second" and asked Cole if he would "second" Wilson's anticipated motion. After some discussion, Cole refused to "second" the motion, although when the meeting was actually held, he changed his mind and did "second" the motion.
Cole testified that the plaintiffs and Holder told him that they had no complaint about David Horton and his abilities as a fire fighter, but they simply wanted Chief Mallott to know he could not always get his way. They felt that tabling the motion of Horton would show this to the Chief. Plaintiffs denied the motivation portion of Cole's testimony, but did state that they *993 had no complaint with David Horton and his abilities.
The council met April 4, 1989 and councilman Wilson did move to table the application for reinstatement of David Horton as a fire fighter. Cole seconded the motion and both voted in favor of the motion, but all other council members voted against the motion to table, and the motion was defeated. Thereafter, the application was voted on and the council voted to reinstate David Horton as a fire fighter. Following the meeting, Wilson told Chief Mallott of the discussion between Busch and himself, the fire fighters meeting of April 1st and the meeting of plaintiffs and Holder with Cole.
After the council meeting of April 4, 1989, there was some publicity about Horton's reinstatement. David Horton and his brother, Bob, by happenstance, met in Bill's Barbeque Shop in Kennett and discussed the publicity. David understood that the publicity was from the newspaper, and Bob Horton understood that it was a radio broadcast. In each situation, the report was that the reinstatement of David created some controversy at the council meeting because David Horton was reported to be a trouble maker. Plaintiff Shands was also in the restaurant and overheard the conversation and then participated in it. David told Shands that he was concerned because he felt his former fire fighter colleagues did not want him. Shands assured both Hortons that the motion to table, and the discussion at the council meeting was not personally lodged against David, but was to show Chief Mallott that he could not always get his way before the council. At a subsequent fairness hearing, plaintiff Shands was asked about the conversation with the two Hortons, and he said that "if those boys say that's what I said, I guess I did."
After further investigation into the matter following the council meeting of April 4, 1989, Chief Mallott felt that it was necessary to terminate the plaintiffs and Bob Holder. He approached the members of the fire committee and was only able to reach Talley and Repstock as Vardell could not be located. Mallott indicated to Talley and Repstock that the plaintiffs and Holder had gone behind his back and were disrupting the operation of the department. Talley and Repstock agreed with Chief Mallott and as two of the three members of the committee could decide this matter, it was decided to follow the recommendation of the Chief in the absence of the third member, Vardell.
In the interim, Chief Mallott had also discussed the matter with Mayor Karsten on May 9th. The mayor told the chief that he would consent to terminating the plaintiffs and Holder from their jobs as volunteer fire fighters provided that the fire committee consented.
After obtaining the approval of the Mayor and two of the three members of the fire committee, Chief Mallott issued written notifications of termination to the plaintiffs and to Bob Holder on April 10, 1989. The reasons given for the terminations were "misconduct and insubordination."
Thereafter, the terminations and events leading up to them were aired on radio, television and in the newspaper. At 7:00 a.m., April 11, 1989, plaintiff Busch was in a Kennett cafe having breakfast and showed his termination letter to Jeff Wheeler, manager of the local radio station. Wheeler had a talk radio show and shortly after this reported what had happened on his show. In the radio show, he did not report that he had received this information direct from plaintiff Busch. The matter was also presented on a nearby television news broadcast in Paragould, Arkansas and numerous articles were written in the Kennett Daily Dunklin Democrat. It was even reported in a news story on KFVS-TV in Cape Girardeau.
Linda Redeffer, a reporter for the newspaper, spoke with plaintiff Busch about the problem and he told her he was fired for insubordination. Defendant Talley and Karsten told her they were concerned about an audit of the Fire Department suggesting the possibility of an impropriety, and Talley indicated that he had received threatening phone calls such as someone indicating they would slash his tires.
*994 Chief Mallott told her that the reason for the termination was "insubordination to a standing city policy."
Plaintiff Shands told her he was going to run Chief Mallott out of town, like he did the former city manager.
All of the plaintiffs in their testimony stated that they had no animosity to Chief Mallott, and that they felt they got along with him quite well before their termination. Some witnesses testified that the relationship between Chief Mallott and the fire fighters was good. Others testified that it was hostile throughout the three months and 10 days he was chief before the terminations.
Irrespective of plaintiff Shands' testimony that he had no animosity to the chief, he admitted that he had stated he would spend $10,000.00 to get even and get Chief Mallott fired.
The entire affair created a considerable amount of furor in Kennett. The City Council, either at the request of plaintiffs or on its own, convened a town hall type of meeting on April 18, 1989 for the purpose of allowing plaintiffs and any one else to express an opinion about the layoffs.
All of the plaintiffs and Bob Holder attended that meeting together with their counsel, Jim R. Bruce.
Bob Holder read a prepared statement wherein he objected to his termination and that of the plaintiffs. All of the members of the council were present as was Chief Mallott and the Mayor. As the main spokesman, Holder testified that he felt he and the plaintiffs had the opportunity at this meeting to tell their story. There was a substantial crowd of townspeople at the meeting, and it was covered by radio, television and press. The Mayor announced that anyone who wanted to talk could do so, and there would be no time limits. Attorney Bruce and the plaintiffs were allowed to question anyone who made a statement and they did.
Either shortly before or after this town meeting, plaintiffs and Holder felt that they should disseminate their point of view and they bought a newspaper ad in the Daily Dunklin Democrat setting out their position. At some point during these proceedings, Holder told the newspaper reporter, Redeffer, that he felt Chief Mallott was on an ego trip. Chief Mallott was also interviewed on television, and there presented his point of view.
Thereafter, request was made to reinstate the plaintiffs and Bob Holder, and this was considered at a regular council meeting on May 4, 1989. This evolved into a meeting similar to the one on April 18, 1989, except that it was a partially closed session. Only the councilmen were present as was Chief Mallott and all of the plaintiffs, Holder and counsel Bruce. Again, the parties talked before the council and attorney Bruce was allowed to ask questions of anyone who talked and everyone apparently was able to have input as to their feelings concerning the terminations and potential reinstatements. At a later meeting on May 16th, in closed session, the council elected not to reinstate the plaintiffs and Holder.
No one complained at the April 18th or the May 4th meeting that they were not allowed to talk or ask questions, nor did anyone complain about the methodology of conducting both meetings.
The case was submitted to the jury on two theories. The first was that the defendants violated plaintiffs' first amendment rights by discharging them because they exercised their rights of freedom of speech, association and petition. The second theory was a breach of plaintiffs' fourteenth amendment rights wherein a public employee is discharged and the employer makes false and stigmatizing charges against the employee in connection with the discharge. Under these circumstances, the employee is entitled to have a "name clearing hearing" in order to afford him due process. The jury found for the plaintiffs and against the defendants on both theories of recovery and awarded actual and punitive damages.
With respect to the fourteenth amendment claim, the Court instructed the jury as follows:

*995 Your verdict must be for the plaintiffs on their Fourteenth Amendment due process claim if you believe:
FIRST, that plaintiffs were discharged from the employment with the City of Kennett;
SECOND, that city officials, including defendants Talley, Karsten or Mallott, made statements which in the eyes of the public suggested, implied or created the false impression that plaintiffs had taken money, manipulated figures on fire reports, slashed tires, made threatening telephone calls or received payment from the city for services when none had been performed;
THIRD, that such statements were made in connection with plaintiffs' discharge from employment with the City of Kennett;
FOURTH, that plaintiffs requested a hearing to clear their names;
FIFTH, that defendants City of Kennett, and defendants Karsten, Cole, Vardell and Mallott failed to provide plaintiffs a public hearing and a meaningful opportunity to confront the evidence against them and to clear their names.
SIXTH, plaintiffs suffered damages as a result of the denial.
The Court also instructed the jury that due process is required when a public employee is discharged and the employer publicly makes false and stigmatizing charges against the employee in connection with the discharge. The Court told the jury further that the term "stigmatizing" means "that which seriously damages one's standing and associations in the community or which substantially forecloses other opportunity for employment."
There was extensive media coverage of the incidents surrounding the layoffs. Certain conclusionary comments by members of the media derogatory to the plaintiffs were asserted by plaintiffs to come directly from defendants. Defendants, on the other hand, claimed such comments were not made by them, but were statements by the reporters and journalists themselves.
There is further substantial difference of opinion as to whether or not statements or charges made seriously damaged any of the plaintiffs' standing or associations in the community or substantially foreclosed other opportunity for employment. This is a voluntary fire department and there was little or no evidence to show that what was done prevented any of the plaintiffs from having other opportunity for employment. Plaintiff Busch lives five miles north of Kennett and has been in the area for 25 to 30 years. He is in the insurance and real estate business and does some home construction work. There was no testimony to suggest that any of his businesses had suffered as a result of the incidents in question.
Plaintiff Shands worked for Arkansas-Missouri Power and Light Company for 32 years as a foreman, and has retired from that job and now has a local electric business. There is nothing to show that his current business has suffered as a result of the incident. Plaintiff Don Key has been a Kennett resident for 40 years. He has owned and operated Don's Supply Shop for 28 years. Again, there is nothing in the evidence to show that his business has suffered because of the termination.
The Court finds therefore that it could determine as a matter of law that there is no substantial evidence upon which the jury could have determined that the plaintiffs have been stigmatized by the events that happened. There is no evidence to show that they suffered economic damage or lost any opportunity for employment.
Nonetheless, more importantly, even if the Court were to determine that plaintiffs were entitled to due process hearings because of their discharge, as a matter of law the due process was, in fact, afforded all plaintiffs.
The Court's verdict director instruction told the jury that one of the elements that they must find in favor of the plaintiffs in order to return a verdict for plaintiffs on their fourteenth amendment claim was:
Defendants City of Kennett and defendants Karsten, Cole, Vardell and Mallott failed to provide plaintiffs a public hearing and a meaningful opportunity to confront *996 the evidence against them and to clear their names.
Generally, the parties do not dispute the proposition that if a person's name, reputation, honor or integrity is at stake because of what a governmental entity may be doing to that person, notice and an opportunity to be heard are essential. Due process would accord an opportunity to refute any charges made. The purpose of such due process which is notice and hearing is to provide the person an opportunity to clear his name. Board of Regents v. Roth, 408 U.S. 564, 573, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The parties disagree that the defendants afforded plaintiffs a public hearing and a meaningful opportunity to confront the evidence against them and to clear their names.
Plaintiffs suggest that they were entitled to notice and a meaningful opportunity to respond to the charges and then for the issue to be decided by an impartial decision-maker. In support of this proposition, the plaintiffs first cite Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). This case is not precisely on point as it determines what type of due process is required in a pre-termination situation. Nonetheless, there are some comments made in Cleveland which are pertinent in connection with any kind of due process availability. In Cleveland, the court suggests that there be notice and opportunity for hearing appropriate to the nature of the case. Id. at 542, 105 S.Ct. at 1493. "The essential requirements of due process and all that respondents seek or the Court of Appeals requires are notice and an opportunity to respond." Id. at 546, 105 S.Ct. at 1495.
Plaintiffs also cite as support for their position Brady v. Gebbie, 859 F.2d 1543 (9th Cir.1988). The Brady case did, in fact, address the fundamental need for due process when a liberty interest is involved. Where a person has been deprived of a liberty interest without due process, the hearing required must provide the aggrieved party with an opportunity to clear his name. Brady v. Gebbie, at 1554.
Where a property interest is involved, something additional is ordinarily required such as an impartial decision-maker. The present case does not involve a property interest. Robinson v. City of Montgomery City, 809 F.2d 1355, 1356 (8th Cir.1987) aff. 651 F.Supp. 493 (E.D.Mo.1986); Armer v. City of Salem, 861 F.2d 514 (8th Cir.1988).
Thus, considering all of the favorable evidence to plaintiffs in this case, could the jury have found that the plaintiffs were deprived of an opportunity to clear their names? I believe not.
One week after discharge, the plaintiffs were entitled to be present at a public meeting at which the Mayor, City Council and the City Attorney were present. Plaintiffs' counsel was also present as was the press and numerous interested local citizens. The Mayor allowed anyone to comment that desired to do so, and he placed no time restriction on the comments.
The Mayor first allowed Bob Holder to make a prepared statement on behalf of himself and the plaintiffs. This statement was elaborate and carefully worked out, and set out all of the concerns of the plaintiffs and Holder. It attempted to refute any impropriety or wrongdoing or inappropriate conduct on the part of the plaintiffs.
Other plaintiffs made oral presentations, and various members of the council and interested citizens made presentations. After each presentation the Mayor allowed attorney Bruce to question that person concerning his or her statement. All in all, there was a complete disclosure by all parties as to what had happened, albeit some of the statements may not have been satisfactory to the parties involved. The Court concludes, therefore, that this meeting in and of itself satisfied due process requirements where an alleged liberty interest had been lost as had been asserted here. The parties had ample time to prepare, everyone was present, and the parties and counsel had a full opportunity to participate.
That hearing was bolstered by still another hearing on May 4, 1989 at a closed session of the council. Although the session was closed, plaintiffs and their attorney were present, and again, all of the *997 interested parties had an opportunity to express their views about the events in question and plaintiffs and their counsel again, were allowed to participate fully, and allowed to make whatever statements they desired. Plaintiffs, therefore, had every opportunity to clear their names which is all that is required to meet their due process rights. Judgment notwithstanding the verdict shall therefore be entered in favor of defendants on the fourteenth amendment claim.
The Court's verdict director instruction on plaintiffs' first amendment claim was as follows:
Your verdict must be for the plaintiffs on their first amendment freedom of speech and petition claim if you believe:
1. The plaintiffs exercised their first amendment right of freedom of speech and petition by speaking on matters relating to the fire department;
2. The exercise of their first amendment rights of freedom of speech was a substantial or motivating factor in the decision of the defendants to discharge plaintiffs from employment or their refusal to reinstate plaintiffs following their discharge;
3. The private statements to Councilman Cole did not unduly interfere with the plaintiffs' ability to perform their duties in the fire department or cause any actual or potential disruption to the fire department in the performance of its functions;
4. Plaintiffs suffered damages as a result of the denial of their first amendment rights.
5. That defendants would not have dismissed or refused to reinstate plaintiffs except for the fact that they had exercised their first amendment rights.
Although the substantial testimony in the case is that the plaintiffs and Bob Holder were terminated because they opposed some of the policies of the Chief and attempted to manipulate the City Council to postpone the Chief's decision to employ David Horton, it is conceivable that the jury could have inferred that the plaintiffs were terminated because of their exercise of speaking rights. The jury conceivably could have determined that plaintiffs were terminated because of various statements made about their safety concerns, the purported inadequacy of the surplus equipment the Chief was buying and the lack of attention to employing an electrician-type fire fighter. The Court, however, cannot find evidence even when considered in the light most favorable to plaintiffs that "the private statements to Councilman Cole did not unduly interfere with the plaintiffs' ability to perform their duties in the fire department or cause any actual or potential disruptions to the fire department in the performance of its functions."
The meeting with Cole undermined the entire operation of the fire department. It indicated a complete lack of regard for rank on behalf of the plaintiffs, and suggested that they would proceed at any cost to have their way. They did just that and attempted to manipulate Chief Mallott's bosses, that is, the City Council, by making arrangements with friends of the fire fighters on the council to delay proposals advanced by Chief Mallott.
Chief Mallott was the Chief. Although he may not have had a proper rapport with his men, and some of his methods might not have been acceptable to all, he was still the Chief. His authority should not be subject to question unless he was violating the law or not following a policy of the city or was himself acting in such a devious way that would disrupt the activities of the department and make the department unmanageable. Was the Chief to run the fire department as governed by the council and the fire committee, or were the plaintiffs and some of the men running the department?
The verdict director instruction was tendered by the plaintiffs and generally submits the law properly in cases of this nature. A public employee certainly has the right of free speech at all times, however, it is not without some restraints. Pickering v. Board of Education of Township High School, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). There is simply no evidence in plaintiffs' favor to suggest anything *998 else that the purpose of the meeting with Cole and others was to undermine and challenge the Chief's authority.
In addition, the evidence shows as a matter of law that defendants had the right to terminate plaintiffs. The limited First Amendment interest of plaintiffs did not require that defendants tolerate action which defendants reasonably believed would disrupt the office of the Fire Chief, undermine his authority, and destroy close working relationships between the Chief and his men. Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Judgment notwithstanding the verdict, therefore, should also be entered in favor of the defendants on plaintiffs' first amendment claim.
Although it is unnecessary in view of the foregoing holdings to consider the question of damages, the Court notes that there was simply no evidence to support a submission of a punitive claim against defendants.
JUDGMENT IS THEREFORE ENTERED in favor of all defendants and against plaintiffs on all their claims, notwithstanding the verdict reached by the jury.
IT IS FURTHER ORDERED that all other motions in this case not heretofore ruled on are determined to be moot in light of this judgment.