Richard S. BARTON, Plaintiff,

v.

CITY OF PORTLAND, a political subdivision of the State of Oregon; the Honorable Vera Katz, individually and as Mayor of the City of Portland, Oregon; and Mark A. Kroeker, individually and as Chief of Police, Portland Police Bureau of the City of Portland, Defendants.

No. CV–01–361–ST.

United States District Court, D. Oregon.

Nov. 27, 2002.

Bernard Jolles, Jolles Bernstein & Garone PC, Portland, OR, for Plaintiff.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### INTRODUCTION

Plaintiff, Richard S. Barton ("Barton"), is a former police officer with defendant, the City of Portland ("Portland"). Barton alleges that defendants Portland, its mayor, Vera Katz ("Katz"), and its Chief of Police, Mark A. Kroeker ("Kroeker"), violated his due process rights in terminating him following an investigation of leave and overtime pay practices in the Portland Police Bureau ("PPB"). Barton alleges a claim against all defendants under 42 USC § 1983 (Count I) for deprivation of his liberty interests without due process of law, and a supplemental state claim for defamation against Portland only (Count II). However, on August 5, 2002, Barton's attorney sent a letter to defendants' attorney stating that Barton was abandoning his claim for defamation. Johnston Aff., Ex. 15. Thus, the only claim now at issue is Barton's § 1983 claim.

This court has jurisdiction over Barton's § 1983 claim pursuant to 42 USC § 1331 and 28 USC § 1343. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 USC § 636(c). Defendants filed a Motion for Summary Judgment (docket # 33), which this court granted on October 23, 2002. *See* Order (docket # 67). This Opinion provides the reasons for that ruling.

### ANALYSIS

Defendants argue that they are entitled to summary judgment against Barton's due process claim because he cannot show either a protected liberty interest or a constitutionally deficient procedure in connection with his termination. In addition, defendants Katz and Kroeker argue that they are entitled to qualified immunity.

This court assumes, without deciding, that Barton's evidence is sufficient to establish that his liberty interests were implicated in the course of his termination, thereby triggering the procedural protections of due process. *See, e.g., Brady v. Gebbie,* 859 F.2d 1543, 1552 (9th Cir.1988), *cert denied* 489 U.S. 1100, 109 S.Ct. 1577, 103 L.Ed.2d 943 (1989). Based on that assumption, this court need not address the details of defendants' public statements concerning the alleged overtime abuse with which Barton was charged. Nevertheless, an exhaustive review of the record reveals that Barton was given all the process to which he was entitled for constitutional purposes. As a result, this court focuses on those issues and expresses no opinion regarding the other grounds

for summary judgment raised by defendants.

## I. *Legal Standards Governing Motions for Summary Judgment*

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party does so, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The court must "not weigh the evidence or determine the truth of the matter, but only determines whether there is a genuine issue for trial." *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir.1999). A " 'scintilla of evidence,' or evidence that is 'merely colorable' or 'not significantly probative,' " does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1542 (9th Cir.), *cert denied*, 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir.1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* at 631 (citation omitted). Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the non-moving party's claims are factually *"implausible,* that party must come forward with more persuasive evidence than would otherwise be [required] ...." *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.,* 818 F.2d 1466, 1468 (9th Cir.1987), *cert denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988) (emphasis in original) (citation omitted). The Ninth Circuit has found, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.*

## II. *Undisputed Facts*

Because all material facts must be viewed in the light most favorable to the non-movant, this court will view the evidence in the light most favorable to Barton. A review of the parties' submissions, including affidavits, declarations, and deposition excerpts,[1] reveals the following facts.

### A. *Operation Northstar*

Katz is Portland's Police Commissioner and has sole authority for hiring and firing Portland's Chief of Police. Between January and July 1999, the Chief of Police was Charles Moose ("Moose"). Between July and December 1999, Lynnae Berg ("Berg") was the interim Chief of Police.

Barton began working for the PPB in August of 1975 and was promoted to sergeant in approximately February of 1984. Barton Aff., ¶ 1. At all material times, Barton was both a Civil Service employee and a member of the Portland Police Association ("Union").

In October 1996, Barton was assigned to work as the lead supervisory sergeant on the afternoon shift of a project called "Operation Northstar," which consisted of undercover drug missions aimed at curtailing

---

1. Excerpts from affidavits, declarations, and depositions are identified by the last name of the affiant, declarant, or deponent, and citations are to the paragraph(s) of the affidavit or declaration, or page(s) of the deposition transcript. Unless otherwise noted, all references to depositions are to those taken in this case.

the buying and selling of drugs in the downtown core area and Old Town. *Id.* at ¶¶ 1, 2. Some portion of Operation Northstar was federally funded by a Bureau of Justice Assistance Law Enforcement Block Grant. *See* Berg Aff., Ex. 1, p. 2. The undercover missions involved two teams—a buy team and a reverse-buy team. Barton and Rocky Balada ("Balada") were the two primary (full time) supervisory sergeants of the missions and Barton was the lead supervisory sergeant for the buy team. *Id.* at ¶ 2.

## B. *Investigation of Leave and Overtime Abuse Allegations*

In February 1999, the PPB began an Internal Affairs Division ("IAD") investigation of alleged leave and overtime abuse associated with Operation Northstar. Sizer Aff., ¶ 2; Berg Aff., Ex. 1. The Multnomah County District Attorney's Office also began a criminal investigation of the same allegations.

The Chief of Police is in charge of determining the resources made available to and the time frame for the completion of an IAD Investigation. In or around May 1999, Chief Moose, who was scheduled to leave the PPB in July 1999, made it clear that he wanted the Operation Northstar IAD investigation completed before he left. Berg Depo., p. 17; Sizer Depo., pp. 22–24. Shortly thereafter, on June 9, 1999, the Multnomah County District Attorney's Office declined to prosecute any crimes in connection with the alleged leave and overtime abuse. Hilgenfeld Aff., Ex. S. At that time, the IAD investigation was still ongoing.

As counsel for Barton and the Union, Jamie B. Goldberg ("Goldberg") represented Barton throughout the IAD investigation. Goldberg Aff., ¶ 1. On June 18, 1999, Barton was interviewed by the PPB Detective Division regarding his conduct during Operation Northstar. Prior to this interview, Barton was given a copy of the Portland Police Officers' Bill of Rights. Also prior to this interview and a second interview on July 6, 1999, Barton signed an Internal Investigation Advance Notice Form, stating that he had been informed of the nature of the investigation and provided a reasonable amount of information concerning the allegations. Johnston Aff., Ex. 1; Barton Depo., pp. 240–41.

## C. *Notice of the Charges*

Portland's Personnel Rules require that before an employee is discharged, demoted, or suspended for more than one day, the employee must be provided advanced notice of the proposed disciplinary action. Johnston Aff., Ex. 6, p. 3, Section 6–005. The notice must include the grounds for the proposed action, the effective date, and the right to respond either orally or in writing prior to the final determination of discipline. *Id.,* Section 6–005(1).[2]

In late July or early August 1999, the IAD completed its initial investigation. As part of that investigation, the PPB endeavored to calculate the maximum possible amount of federal funds misappropriated. This "worst case" figure was estimated to be as high as $165,000.

On August 6, 1999, Berg held a public conference concerning the alleged leave and overtime abuse in Operation North-

---

2. The meeting contemplated in Portland's Personnel Rules is described as a "pre-disciplinary" meeting. Johnston Aff., Ex. 6, p. 3, Section 6–005(2). However, the parties refer to the pre-disciplinary meeting as a "mitigation meeting," a "mitigation hearing," and a

"due process meeting." *See* Henderson Aff., Exs. 5–11. This court will refer to the meeting that eventually took place concerning the allegations against Barton as a "mitigation hearing."

star. Berg Aff., ¶ 6. During this conference, Berg announced that up to $165,000 had been fraudulently misappropriated by officers at Central Precinct who worked the afternoon shift drug missions, *i.e.* Operation Northstar, with the supervisors directing and ordering the fraudulent conduct. *Id.,* Ex. 1.

Also on August 6, 1999, the PPB gave Barton written notice of a proposed discipline, suspension with pay pending discharge, for violation of General Order 315.30 (Unsatisfactory Performance). Henderson Aff., Ex. 3. The notice advised Barton that he had until September 6, 1999 to respond to the charges and that if he wished to respond orally, he could meet with Berg on August 24, 1999. *Id.* at 5. The notice specified that, unless Berg withdrew, amended, or otherwise modified the recommendation described in the notice, Barton would be discharged effective September 6, 1999. *Id.*

### D. *Postponement of the Mitigation Hearing*

On or about August 15, 1999, Barton verbally requested a postponement of the mitigation hearing that Berg had scheduled for August 24, 1999. Pursuant to that request, and subsequent requests by Barton or his Union representative, the PPB agreed to reset the mitigation hearing five times to October 21, 1999, November 15, 1999, December 8, 1999, January 10, 2000, and February 28, 2000.

### E. *Evidence Provided to Prior to the Mitigation Hearing*

In November 1999, the PPB sent copies of the evidence, consisting of six notebooks of materials compiled during the IAD investigation, to the Union, the members of the Review Level Committee, the City Attorney's office, the Mayor's office, and the Portland Police Personnel Division. Benshoof Aff., ¶ 2.

### F. *The Mitigation Hearing*

In December 1999, Portland hired Kroeker to be its Chief of Police. On February 23, 2000, Kroeker received a request from Barton's attorney seeking another continuance of the mitigation hearing. However, the PPB declined to reschedule the mitigation hearing. Henderson Aff., Ex. 11.

On February 28, 2000, the PPB convened Barton's mitigation hearing. In addition to Barton, Goldberg, and Kroeker, the mitigation hearing was attended by Berg, and representatives of the Union, the IAD, PPB's Operations Branch and Detective Division, and Portland's Personnel Division and City Attorney's Office. *Id.,* Ex. 12. At the start of the mitigation hearing, Goldberg spoke on Barton's behalf, indicating that Barton had been advised not to say anything due to the pending criminal investigation. *Id.* at 2.

Goldberg then stated that it was his understanding that, following a mitigation hearing that had taken place concerning Balada, many of the witnesses interviewed during the initial IAD investigation had been reinterviewed. *Id.* at 3. Goldberg objected to Barton's mitigation hearing proceeding before Barton had been provided copies of the tapes or transcripts of those "administrative re-interviews." *Id.* at 2–3. After a five minute break with Barton, Goldberg, and the Union representative out of the room, Kroeker stated:

> All right, we're going to go ahead with the hearing at this point. In view of your concerns, what I intend to do is to hold off the final decision until the accused sergeant has those interviews. This may take a very short amount of time. At that point, after he, after you have looked at those, we can convene another short hearing. We'll hold the decision in abeyance until you look at that. If there's something in that that

you believe is percipient to a mitigatable point that you'd like to make, then we can reconvene. So we'll hold off on our decision until you get a chance to look at that.

*Id.* at 4.

Goldberg then called Sergeant James McDaniel ("McDaniel") as a witness on Barton's behalf. McDaniel testified that he had been a lieutenant at Central Precinct during the relevant time frame, had been interviewed as part of the IAD investigation, and was demoted following the investigation. *Id.* at 4–5. McDaniel testified that the summary reports generated during the IAD investigation did not accurately reflect what the actual witnesses had stated when they were interviewed (*id.* at 5–6), that it was a widespread and longstanding "standard practice" at the PPB to sometimes grant "cuff time" to officers by allowing them to leave work before the end of their shifts without being docked for the time (*id.* at 7–9, 14–15), that Barton regularly worked overtime for which he was not paid (*id.* at 9–10), and that he was "stunned" by the allegations in the IAD investigation because they did not comport with what he had observed (*id.* at 13). After McDaniel testified, Goldberg made a lengthy presentation addressing the issues raised in the August 6, 1999 notice. *Id.* at 15–36.

### G. *Termination*

On April 3, 2000, Kroeker issued a Notice of Termination to Barton effective April 6, 2000. Henderson Aff., Ex. 13. Based on evidence presented at the February 28, 2000 mitigation hearing, Kroeker exonerated Barton of one charge of Unsatisfactory Performance, and found insufficient evidence to sustain another charge of Unsatisfactory Performance. Kroeker

sustained the remaining allegations of Unsatisfactory Performance as originally set forth in the charging letter to Barton on August 6, 1999.

### H. *Public Statements Implicating Liberty Interests*

Beginning August 25, 1999, Katz made statements to the press concerning the leave and overtime abuse allegations.[3] Katz Aff., Exs. 2–3. After he became the Chief of Police in December 1999, Kroeker also made statements to members of the press concerning the alleged overtime abuse. Bernstein Aff., Exs. B–D. For purposes of the present motions, this court assumes that those public statements were sufficient to implicate Barton's liberty interests in that the statements were made in connection with Barton's termination and charged Barton with activities (leave and overtime fraud) which impaired his reputation for honesty. *See Brady,* 859 F.2d at 1552.

### I. *Barton's Disability Claim*

On August 5, 1999, the day before he received the notice of the charges against him, Barton applied for disability benefits with/through the Fire and Police Disability and Retirement Fund. Barton's disability claim apparently was based on post traumatic stress disorder flowing from Barton's presence at a hostage incident on January 16, 1992, during which police gunfire killed a 12 year old boy and his captor. Henderson Aff., Ex. 12, p. 33.

On March 14, 2000 (after Barton's mitigation hearing, but prior to his termination), Barton's disability claim was approved with payment retroactive to August 5, 1999. Johnston Aff., Ex. 10, p. 1.

---

**3.** Katz issued a one-line statement on March 19, 1999 that she would "not taint the investigation by commenting until the review is fully completed." Katz Aff., Ex. 1. This non-substantive statement has no bearing on Barton's liberty interest claim.

## J.  *Barton's Bifurcated Appeal*

Portland's Personnel Rules allow employees to appeal disciplinary actions to the Portland Civil Service Review Board ("Board"), or to file a grievance under the relevant collective bargaining agreement. *Id.*, Ex. 6, p. 4, Section 6–010(4). However, any appeal to the Board is confined to the issue of whether the decision "was or was not for a political or religious reason, was or was not made in good faith for the purpose of improving the public service." *Id.*, Ex. 7, p. 2. Barton admits that he could have filed an appeal with the Board over his discharge, but that he failed to do so within the time allowed. Johnston Aff., Ex. 4, p. 5, Answers to Requests for Admission No. 32 & 33. If the employee elects instead to file a grievance under the collective bargaining agreement, the employee waives his right to file an appeal of the disciplinary action with the Board. *Id.*, Ex. 6, p. 4.

On April 24, 2000, Barton elected to file a Union grievance regarding his termination. *Id.*, Ex. 8. In that grievance, Barton argued that his termination was not for just cause, was not in keeping with prior standards for discipline established by the PPB, was based upon an inadequate and a faulty investigation, was motivated by political reasons, and was based in part upon his disability. Barton also argued that the PPB had no right to terminate his employment until his disability claim was resolved and he was returned to active duty, and that disciplining him while he was on disability status violated past practices.

On Barton's behalf, the Union requested that the grievance be bifurcated into two issues, namely: (1) whether Barton could be disciplined while on disability status; and (2) the merits of his termination. Barton Depo., p. 258. At the hearing on defendants' motion for summary judgment, the parties advised the court that the first issue was resolved against Barton and that the second issue (the merits of his termination) was still pending.

## K.  *PPB's Continuing Investigation*

The PPB apparently continued to investigate the alleged leave and overtime abuse into 2001 with the goal of "identify[ing] the hours of cuff time and unearned overtime taken by each officer during Operation North Star." Hilgenfeld Aff., Ex. P, p. 8. On February 15, 2001, Lieutenant Edward A. Herbert ("Herbert") of the PPB issued a 42 page report concluding that the "figure of $165,213 previously released by the [PPB] as an estimate of overtime improperly billed . . . [was] incorrect." *Id.* at 9. Instead, the "grand total of cuff time taken during Operation North Star [was] $22,181" (*id.* at 8–9) and that the "grand total of unearned overtime received during Operation North Star [was] . . . $877." *Id.* at 9. Herbert also concluded that, in part, the reason the previous figure was incorrect was due to overestimations concerning the use of cuff time by several officers that had been interviewed during the initial investigation. *Id.* at 25–26.

## III.  *Liability*

Barton contends that defendants violated his constitutionally protected liberty interests by terminating him amid allegations that he was the ringleader of the overtime abuse uncovered in Operation Northstar. Barton asserts that the mitigation hearing was both untimely and substantively inadequate. With respect to the timing issue, Barton insists that he was entitled to a name-clearing hearing *prior* to his termination. With respect to substantive adequacy, Barton argues that the mitigation hearing was constitutionally flawed because: (1) it was not open to the public; and (2) before he was terminated,

he was not provided copies of tapes or transcripts of several reinterviews. As discussed below, the record does not support Barton's assertion that he was not provided with a timely or adequate name-clearing hearing.

### A. *The Timing Issue—"Predeprivation" Hearings and "Name-clearing" Hearings*

Barton's argument that he was not provided a name-clearing hearing *prior* to his termination too narrowly construes the requirements of the Due Process Clause.

■■■ The termination of an individual from his or her job may implicate two distinct interests, a property interest and a liberty interest. The type of process to which that individual is constitutionally entitled depends upon which interest is affected during the course of the termination. If an individual has a "property" interest in his or her continued employment, then the Due Process Clause prohibits summary dismissal. *See Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (citing cases involving termination of public employment). Instead, he or she must be " 'given an opportunity for a hearing *before* [being] deprived of any significant property interest.' " *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (emphasis in original), quoting *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). This mandated hearing is often referred to as a "predeprivation" or "pretermination" hearing. *Id.* at 545. Barton does not allege that his termination deprived him of a property interest. Instead, he alleges the loss of a "liberty" interest.

■■■ Unlike a property interest, a liberty interest is implicated if the employee can establish that his or her termination was accompanied by the public disclosure of a charge which impairs his or her reputation for honesty or morality. *Brady,* 859 F.2d at 1552. To state a "liberty interest" claim, the plaintiff must present evidence that the charge was contested and publicly disclosed in connection with his termination:

> In order to trigger the procedural protections of due process attendant to a properly presented liberty interest claim, a plaintiff must show that "(1) the accuracy of the charge is contested; (2) there is some public disclosure of the charge; and (3) the charge is made in connection with the termination of employment."

*Brady,* 859 F.2d at 1552, quoting *Matthews v. Harney County, Or., Sch. Dist. No. 4,* 819 F.2d 889, 891–92 (9th Cir.1987). Under these circumstances, the employee must be provided an " 'opportunity to refute the charge' " at a hearing which provides the employee " 'with an opportunity to clear his name.' " *Codd v. Velger,* 429 U.S. 624, 627, 97 S.Ct. 882, 51 L.Ed.2d 92 (1977) (citation omitted). This type of hearing is described as a "name-clearing hearing." *Brady,* 859 F.2d at 1553.

■■■ Whenever a property or liberty interest is implicated, the issue is "whether the timing of [the] hearing comports with due process, given the exigencies and circumstances of any particular case." *Vanelli v. Reynolds Sch. Dist. No. 7,* 667 F.2d 773, 778 (9th Cir.1982). The inquiry turns on a three part balancing test:

> [T]he specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) ("*Eldridge*").

■ Contrary to Barton's assertion, due process does not require that his name-clearing hearing take place prior to his termination unless there are exigent circumstances. Even *Zinermon v. Burch*, 494 U.S. 113, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990) ("*Zinermon*"), which Barton cites for this proposition, recognizes that due process "is a flexible concept that varies with the particular situation" and requires the court to weigh the factors identified in *Eldridge*. *Zinermon*, 494 U.S. at 127, 110 S.Ct. 975. *Zinermon* merely recognizes, consistent with *Eldridge*, that the type of process that will suffice must be examined in light of the private interest affected by the action. *Id.* at 131–32, 110 S.Ct. 975. Because of the "'massive curtailment of liberty'" involved in being confined to a state mental hospital, predeprivation protections were required to prevent mistaken confinements. *Id.* at 131–39, 110 S.Ct. 975, quoting *Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980). The liberty interest involved here simply is not of the same caliber as that involved in *Zinermon*. Thus, a name-clearing hearing may occur after termination if the test articulated in *Eldridge* is satisfied.

■ Barton has not as yet availed himself of all the procedural safeguards available to him. Four years ago, the Ninth Circuit noted that an arbitration hearing provided pursuant to a collective bargaining agreement affords the requisite name-clearing hearing. *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1179 (9th Cir.1998), citing *Komlosi v. New York State Office of Mental Retardation & Developmental Disabilities*, 64 F.3d 810, 817–18 (2nd Cir.1995). Barton filed a grievance concerning his termination and, at the time of the hearing on defendants' motion, was awaiting an arbitration hearing concerning the merits of his termination. Barton admits that the arbitration hearing will be before a neutral factfinder (Johnston Aff., Ex. 4, p. 4), and there is no reason to believe that Barton will be unable to request an open hearing and raise all of the same issues raised in this case concerning the adequacy of the information considered by Katz and Kroeker. Under the reasoning of *Mustafa*, the procedures afforded in the grievance process would adequately protect Barton's due process rights and completely undermine his liberty interest claim.[4]

However, even assuming Barton was entitled to a pre-termination name-clearing hearing, this court finds that the mitigation hearing satisfied the minimum requirements of due process.

## B. *Constitutional Adequacy of the Mitigation Hearing*

■ There is no dispute that Barton was charged with leave and overtime abuse and that he was terminated after the February 28, 2000 mitigation hearing. There is also no dispute that the mitigation hearing was the only pre-termination hearing afforded Barton. As discussed above, the only claim presently at issue in this case is Count I, which alleges that Barton was deprived of his liberty interests without due process. Thus, the narrow issue before this court is whether the February

---

**4.** Arguably, Barton's liberty interest claim is not yet ripe since the arbitration hearing has not yet occurred.

28, 2000 mitigation hearing was sufficient to protect Barton's liberty interests. Imperfect though the process was, this court concludes that Barton received all the process to which he was constitutionally entitled.

Barton argues that the mitigation hearing was flawed in two fundamental respects: (1) it was not open to the public; and (2) it was conducted prior to Barton being provided with copies of the tapes or transcripts of the reinterviews.

### 1. *Open Hearing*

With respect to the first issue, it is incumbent upon the employee to request an open hearing. *See, Gillum v. City of Kerrville,* 3 F.3d 117, 121 (5th Cir.1993), *cert denied,* 510 U.S. 1072, 114 S.Ct. 881, 127 L.Ed.2d 76 (1994); *Arrington v. County of Dallas,* 970 F.2d 1441, 1447 (5th Cir.1992); *Rogosin v. Mayor, City Council of Baltimore,* 197 F Supp 2d 345, 353–54 (D.Md.2002); *Lee v. Morial,* 2000 WL 726882 *6 (E.D.La.2000); *Sims v. City of New London,* 738 F.Supp. 638, 645 (D.Conn.1990) (citation omitted). In this case, nothing in the record indicates that Barton requested any hearing, much less a public hearing. Moreover, as discussed above, the pending grievance proceedings provide a constitutionally adequate forum for Barton to clear his name. Thus, this court rejects Barton's argument that his constitutional rights were violated because the mitigation hearing was not open to the public. To hold otherwise would put the PPB in the untenable position of violating the collective bargaining agreement if it unilaterally opened the mitigation hearing to the public, and facing a claim of a constitutional violation if it did not.

### 2. *Fairness of Hearing*

The purpose of a predeprivation or pretermination hearing is to provide "an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action." *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487. A name-clearing hearing is designed to give the employee an "opportunity to clear his name." *Codd,* 429 U.S. at 627, 97 S.Ct. 882. Moreover, the Supreme Court has declared that a "pretermination 'hearing,' though necessary, need not be elaborate. [Instead,] '[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.'" *Loudermill,* 470 U.S. at 545, 105 S.Ct. 1487, quoting *Boddie,* 401 U.S. at 378, 91 S.Ct. 780. Generally, the pretermination process "need only include oral or written notice of the charges, an explanation of the employer's evidence, and an opportunity for the employee to tell his side of the story." *Gilbert v. Homar,* 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) (interpreting *Loudermill, supra* ). The mitigation hearing clearly satisfied all of these requirements.

The record reveals that Barton had ample notice of the charges against him. He was notified of the charges on or about August 6, 1999, when he was suspended with pay pending his discharge. Henderson Aff., Ex. 3. The memorandum suspending Barton states that he was charged with "Unsatisfactory Performance," and gives a lengthy explanation of the reasons for his proposed discharge. *Id.* at 1. It also advised Barton that he could respond to the charges either orally or in writing by September 6, 1999, and set August 24, 1999, as the date for Barton's mitigation hearing, during which he was advised he could make any oral presentation to the Chief of Police. *Id.* at 5.

After being rescheduled several times, the mitigation hearing finally took place on

February 28, 2000. Barton, Goldberg, and a union representative all attended the mitigation hearing. A witness testified on Barton's behalf, and Goldberg made an oral presentation lasting approximately two hours, submitting written evidence and addressing each issue raised in the August 6, 1999 notice of proposed discipline. *Id.*, Ex. 12. Goldberg questioned the accuracy of the underlying investigation including questioning the credibility of the witnesses who had been interviewed, argued that the alleged abuses were long-standing practices within the PPB, and pointed out that Barton had worked but not reported significant amounts of overtime. Goldberg discussed point-by-point most, if not all, of the charges listed in the August 6, 1999 notice, and questioned whether Barton could be terminated while he was on disability leave.

Nevertheless, Barton argues that he has raised an issue of fact that the mitigation hearing was constitutionally deficient because: (1) Kroeker stated that Barton would receive copies of the reinterviews and that no decision would be made until Barton had a chance to review those reinterviews; and (2) Barton never in fact received tapes or transcripts of the reinterviews.

During the mitigation hearing, Kroeker told Barton that he would be provided with copies of the reinterviews.[5] Apparently, no one followed up on that statement and Kroeker was never informed of any need for any additional hearing. Kroeker Depo., pp. 131–33. Within about a month, Katz and Kroeker decided it was time to complete the disciplinary process concerning Barton. *Id.* at 134. On April 3, 2000, they terminated Barton effective April 6, 2000. Henderson Aff., Ex. 13.

■ There simply is no constitutional violation if procedures more generous than constitutional minimums are not followed: " 'if state procedures rise above the floor set by the due process clause, a state could fail to follow its own procedures yet still provide sufficient process to survive constitutional scrutiny.' " *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir.1994), quoting *Rogers v. Okin*, 738 F.2d 1, 8 (1st Cir. 1984). Instead, the focus of the inquiry must be on whether the process received by Barton satisfied minimum constitutional standards. Barton contends, however, that a jury could reasonably determine that Kroeker's promise to provide the reinterviews before making a decision was a tacit acknowledgment that providing the reinterviews and continuing the hearing was necessary to comply with the minimum requirements of due process. Nonetheless, Barton's lack of access to the reinterviews does not alter the constitutional sufficiency of the mitigation hearing.

The unspoken premise of Barton's arguments regarding his lack of access is that the reinterviews would have allowed him to establish that the charges against him were either false or grossly overstated. As

---

5. The record does not definitively answer the question of exactly what reinterviews may have taken place. At the hearing on this motion, counsel for defendants argued strenuously that the record revealed that Barton had been provided with all the reinterviews. Defendants also seek to strike the affidavits of Aitchison and Goldberg on the ground that they have no personal knowledge regarding that issue. However, the record seems to support Barton's argument that, at a minimum, he was not provided with copies of transcripts or tapes of the reinterviews of Officers Anderson, Hooper, Christensen, and Detective Heimbach. Johnston Aff., Ex. 5, pp. 2–3. Moreover, the Herbert report supports Barton's position that additional reinterviews were taken between completion of the initial IAD investigation in August 1999 and Barton's mitigation hearing in February 2000. Hilgenfeld Aff., Ex. pp. 12, 26, 45–48. For purposes of these motions, this court will assume this disputed issue in Barton's favor.

an initial matter, it is worth noting that errors in personnel decisions are inevitable, and the Due Process Clause "is not a guarantee against incorrect or ill-advised personnel decisions." *Bishop v. Wood,* 426 U.S. 341, 350, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Instead, due process is denied " 'only if the state fails to provide adequate machinery for the correction of the inevitable errors that occur' " in personnel decisions. *Cohen v. Philadelphia,* 736 F.2d 81, 86 (3rd Cir.), *cert denied,* 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984), quoting *Ellis v. Hamilton,* 669 F.2d 510, 514 (7th Cir.), *cert denied sub nom,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

However, even assuming that Barton had a constitutionally protected right to a "correct" decision, the record reveals that access to the reinterviews would not have altered the outcome. As Herbert's report revealed, several of the officers interviewed during the initial investigation overstated the amount of unauthorized overtime and cuff time. According to Barton, he could have used the reinterviews to challenge the credibility and reliability of the information provided by his main accusers. This line of reasoning has at least two problems.

First, nothing in the record suggests that anyone on the Review Level Committee was provided with or considered the tapes or transcripts of the reinterviews. To the contrary, the record indicates that the basis for Barton's termination was the information in the six IAD investigation binders which he was provided. Kroeker Aff., ¶ 6; Plaintiff's Response to Motions to Strike, p. 6.

Second, at best, the record reveals that the reinterviews would have undermined the testimony as to the *amount* of unauthorized overtime and cuff time, but would not have established that the charges against Barton were completely unfounded. To the contrary, the Herbert report, which was completed well after the reinterviews, expressly "examined the credibility of witnesses on various issues by comparing their statements with an examination of the database" and recognized the overestimations of overtime during initial interviews. Hilgenfeld Aff., Ex. P, pp. 10, 26. It nonetheless concluded that Barton received 25% of the total cuff time taken (*id.* at 9, 26), and acted as the supervisor of officers taking cuff time and claiming unearned overtime.

Besides, even if the reinterviews were material, their nonproduction is not a constitutional defect. In criminal proceedings, the prosecution must disclose exculpatory evidence on its own motion and without request if suppression of the evidence would deprive the defendant of a fair trial. *Hayes v. Woodford,* 301 F.3d 1054, 1075 (9th Cir.2002), citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). However, unlike a criminal trial, which normally results in either acquittal or conviction, a predeprivation hearing is not designed to "definitively resolve the propriety of the discharge." *Loudermill,* 470 U.S. at 545–46, 105 S.Ct. 1487. As a consequence, an employee facing termination is not entitled to every scrap of information concerning the proposed action. Instead, the employee is "entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id.* at 546, 105 S.Ct. 1487 (citations omitted); *see also Gilbert v. Homar,* 520 U.S. 924, 929, 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997) ("[A] public employee dismissable only for cause [is] entitled to a very limited hearing prior to his termination, to be followed by a more comprehensive post-termination hearing"). The reason for this limitation is that "[t]o require more … would intrude to an unwarranted extent on the government's interest in quickly removing an un-

satisfactory employee." *Loudermill*, 470 U.S. at 546, 105 S.Ct. 1487.

The Ninth Circuit has described the requirements established by the Supreme Court for predeprivation hearings as "rather meager." *Brewster v. Board of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 986 (9th Cir.1998), *cert denied*, 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999) (citation omitted). Accepting Barton's suggestion that his predeprivation hearing was constitutionally inadequate because he was not provided with several reinterviews would turn those "rather meager" requirements into a mandate of procedures approaching those involved in criminal trials. This court rejects this invitation and finds that the procedures Barton received prior to termination, combined with the pending arbitration proceedings, provide Barton with all his constitutional due process.

## C. *Conclusion*

For all of the above reasons, this court concludes that Barton has no viable claim premised upon a deprivation of his liberty interests and has received (or will receive in the arbitration proceedings) all the due process to which he is constitutionally entitled. As a result, this court need not, and does not, express an opinion concerning the multitude of other issues raised by defendants in support of their motion.

## *CONCLUSION*

For the reasons stated above, and in accordance with the Order dated October 23, 2002 (docket # 67), defendants' Motion for Summary Judgment (docket # 33) is GRANTED.